UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| NECA-IBEW PENSION FUND (THE DECATUR PLAN), Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:10-cv-05339 |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | Judge Joan H. Lefkow |
| vs. | ) ) | |
| NORTHERN TRUST CORPORATION, et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

AMENDED COMPLAINT FOR VIOLATION OF THE
SECURITIES EXCHANGE ACT OF 1934

1.      Lead Plaintiff City of Westland Police and Fire Retirement System and named plaintiff United Wire Metal and Machine Pension Fund, by their attorneys, allege the following based on the investigation by counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Northern Trust Corporation ("Northern Trust" or the "Company"), press releases issued by Northern Trust, public statements issued by defendants, securities analysts' reports about the Company, court filings from related cases and media reports about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

2.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Northern Trust between October 17, 2007 and October 20, 2009, inclusive (the "Class Period"), against Northern Trust and certain of its officers and directors for violations of the Securities Exchange Act of 1934, 15 U.S.C. §78t *et seq.*("1934 Act").

3.      Northern Trust, headquartered in Chicago, Illinois, is a financial holding company that provides asset servicing, fund administration, investment management, banking and fiduciary solutions for corporations, institutions and affluent individuals worldwide.  The Company conducts business through various U.S. and non-U.S. subsidiaries, including The Northern Trust Company ("NTC"), which provides banking and agency functions for clients, and Northern Trust Investments, Inc. ("NTI"), which managed Northern Trust's securities lending program.

4.      During the Class Period, the Northern Trust defendants issued materially false or misleading statements regarding the Company's business and financial results.  Defendants' misconduct harmed Northern Trust's investors by failing to disclose the full extent of the serious delinquencies in its loan portfolio, allowing it to under reserve for loan losses and thereby overstate its earnings.  The Company also failed to disclose the true nature of and risks in its once highly

profitable securities lending program, leading both its clients and investors to overvalue the Company's capacity to generate investment returns and fee revenue. As a result of defendants' false statements, Northern Trust's stock traded at artificially inflated prices during the Class Period, reaching a high of $87.20 per share on September 11, 2008. The top officers and directors of Northern Trust also benefited, as the Company's favorable, but false financial results contributed to the compensation paid to the top officers during the Class Period, some of whom received as much as $14 million per year. In addition, while Northern Trust's stock was artificially inflated due to defendants' false statements, certain top officers and directors of the Company sold over 1.5 million shares of their Northern Trust stock for proceeds of over $106.5 million.

5. On September 17, 2008 Northern Trust acknowledged that its clients – but not the Company – were holding assets that had been permanently impaired. On September 29, 2008 Northern Trust announced that it would take hundreds of millions of dollars in pre-tax charges to support funds – including investment funds involved in the securities lending program – because of the significant devaluation related to turmoil in the financial markets. Northern Trust specified that $150 million would be used "to provide support for securities lending clients whose cash collateral is invested in five constant dollar, commingled investment pools negatively impacted by recent market events." This support, which was increased to $168 million by quarter end, was necessitated and caused by Northern Trust's imprudent – and undisclosed – investing practices relating to its securities lending program.

6. On April 21, 2009, before the market opened, Northern Trust reported its first quarter 2009 ("1Q 2009") earnings results, announcing the 1Q results had fallen well short of expectations due to a large spike in the Company's loan loss provision. On this news, Northern Trust's stock dropped $1.98 per share on volume of nearly 14 million shares to close at $56.17 per share. Nonetheless, given defendants' assurances that Northern Trust's "credit quality remains very, very

- 2 -

strong" and that defendants still felt "very solid" about the Company's portfolio, investors remained unaware of the misrepresentations about the health of the Company's loan portfolio.  As a result, Northern Trust's stock continued to trade at artificially inflated levels.

7.      Then, on October 21, 2009, before the market opened, Northern Trust reported its 3Q 2009 earnings results, announcing the 3Q results had fallen well short of expectations due in part to problems with its risky loan portfolio and continuing pressure from its nonperforming loans.

8.      On this news, Northern Trust's stock fell another $3.29 per share to close at $54.16 per share on October 21, 2009, a one-day decline of nearly 6% on volume of over 8.55 million shares.

9.      Defendants' statements between October 17, 2007 and October 20, 2009 were false or misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose the following:

(a)      As detailed in ¶¶120-156, rather than appropriately accounting for the known and increasing impairments to Northern Trust's home lending and commercial real estate portfolio – and the resulting inflation of the Company's assets – defendants failed to comply with Generally Accepted Accounting Principles ("GAAP") and appropriately reserve for the Company's loan loss exposure;

(b)      As a result of defendants' GAAP violations, Northern Trust's reported net income and EPS for 3Q 2007 through 2Q 2009 were materially overstated;

(c)      Northern Trust's loan portfolio was not "exceptional" and "extremely clean" nor was its relationship lending strategy "conservative", but rather, its loan quality had been weakened as defendants reduced credit standards to attract and maintain its fee-based client business. As a result, default rates and delinquencies were rising sharply;

- 3 -

(d)     As a result of defendants' weakening of Northern Trust's lending standards, Northern Trust originated inherently risky loans, such as adjustable-rate mortgages, home equity lines of credit and mortgages for vacation homes, particularly in high risk states such as Illinois and Florida;

(e)     Defendants Waddell and Fradkin's certifications included in Northern Trust's FY 2007 Form 10-K and 10-Q reports during this period, stating that the Company's financial results were reported in accordance with GAAP were, as described below in ¶¶120-156, false or misleading when executed;

(f)     Northern Trust was investing in higher-return securities, which while generating more revenue for Northern Trust, also made the collateral pools' portfolios longer-term, riskier and increasingly illiquid;

(g)     Northern Trust was not disclosing the true risks inhering in its securities lending program and the program's continuing capacity to generate revenue at previous levels.  This was so because Northern Trust's Class Period investment strategy exposed participating clients to collateral devaluation and deficiencies, undermining their continued participation in securities lending;

(h)     Northern Trust was effectively ignoring rapidly increasing unrealized losses in the collateral pools, choosing instead to encourage clients to continue their participation through the securities' maturity so that the losses would not have to be immediately realized; and

(i)     Though aware of the increasing risks to the securities lending program – and its clients – Northern Trust did not properly mitigate increasingly significant investment exposures.

10.     As a result of defendants' false statements and omissions, Northern Trust's common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales,

- 4 -

ultimately sending them down nearly 38% from their Class Period high.  The following stock price

chart evidences Northern Trust's outperformance of an index of its banking peers (Keefe Bruyette &

Woods Bank Index) and a broader market index (Standard &Poor's 500) through the Class Period as

the truth regarding its securities lending program and loan losses remained undisclosed.



**JURISDICTION AND VENUE**

11.     Jurisdiction is conferred by §27 of the 1934 Act and 28 U.S.C. §§1331, 1337.  The

claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

12.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C.

§1391(b).  Many of the acts and false or misleading statements alleged were undertaken, made in or

issued from this District.

- 5 -

13.     Northern Trust's principal executive offices are located at 50 South LaSalle Street, Chicago, Illinois.

## PARTIES

**Plaintiffs**

14.     Lead Plaintiff City of Westland Police and Fire Retirement System ("Westland") purchased 7,904 shares of Northern Trust common stock.  Westland's certification for its transactions in Northern Trust stock was previously filed with this Court on October 25, 2010.  *See* Docket No. 13-3.  As a result of defendants' false statements and omissions, Westland suffered damages in connection with its purchases of Northern Trust common stock.

15.     Plaintiff United Wire Metal and Machine Pension Fund ("United Wire") purchased 11,332 shares of Northern Trust common stock as identified in the certification attached as Exhibit A.  As a result of defendants' false statements and omissions, United Wire suffered damages in connection with its purchases of Northern Trust common stock.

**Northern Trust Defendants**

16.     Defendant Northern Trust is a financial holding company that provides asset servicing, fund administration, investment management, banking and fiduciary solutions for corporations, institutions and affluent individuals worldwide.  Founded in 1889, Northern Trust is headquartered in the Chicago financial district, and conducts its business through its U.S. operations and its various U.S. and non-U.S. branches and subsidiaries.

17.     Defendant William A. Osborn ("Osborn") served as Chairman of the Board of Northern Trust from 1995 through November 2009 and served as Chief Executive Officer ("CEO") of the Company from 1995 through December 31, 2007.  According to the Company's 2007 Financial Annual Report to Shareholders, defendant Osborn was considered "the chief operating

decision maker."  During the Class Period, Osborn reaped over $19.8 million in insider trading proceeds by selling 303,584 shares of his Northern Trust stock at artificially inflated prices.

18.     Defendant Frederick H. Waddell ("Waddell") has served as President of Northern Trust since February 2006 and as CEO since January 1, 2008.  Defendant Waddell has been Chairman of the Board of Northern Trust since November 2009 and, according to the Company's 2009 Financial Annual Report to Shareholders, is considered "the chief operating decision maker," with final authority over resource allocation decisions and performance assessment. The heads of Northern Trust's principal operating businesses: Personal Financial Services, Corporate & Institutional Services, Worldwide Operations & Technology and Northern Trust Global Investments ("NTGI") report to defendant Waddell, as well as the heads of Finance, Marketing, Human Resources, Auditing, Corporate Strategy, Risk Management and Legal.  During multiple Class Period conference calls, defendant Waddell spoke on behalf of Northern Trust, including responding to questions from financial analysts regarding the financial performance of the Company's securities lending business, the quality and robustness of its loan portfolio, and the overall strength of Northern Trust's balance sheet and credit quality.  During the Class Period, Waddell reaped nearly $2.3 million in insider trading proceeds by selling 28,900 shares of his Northern Trust stock at artificially inflated prices.

19.     Defendant Steven L. Fradkin ("Fradkin") served as Chief Financial Officer ("CFO") and Executive Vice President of Northern Trust until September 2009 when he became President of the Company's Corporate & Institutional Business Unit.  During a majority of the Class Period conference calls, defendant Fradkin was the primary spokesperson on behalf of Northern Trust, discussing the Company's financial results for a particular time period, as well as fielding questions from financial analysts regarding the financial performance of the Company's securities lending business, the quality and robustness of its loan portfolio, and the overall strength of Northern Trust's

- 7 -

balance sheet and credit quality. During the Class Period, Fradkin reaped $330,305 in insider trading proceeds by selling 4,437 shares of his Northern Trust stock at artificially inflated prices.

20. Defendants Osborn, Waddell and Fradkin (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Northern Trust's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases, alleged herein to be misleading, before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material nonpublic information available only to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

21. Throughout the Class Period, the Individual Defendants were incentivized to maintain the façade that Northern Trust's loan portfolio remained robust, of high quality and free from the credit deterioration plaguing other financial institutions. Northern Trust's executive compensation plan provided for significant additional compensation "if performance goals are achieved or exceeded and, correspondingly, decreases if performance goals are not achieved." Further, these goals turned "on company, business unit, and/or individual performance." For example, in 2007, defendant Osborn's total compensation exceeded $14 million and was "based in part on competitive data received annually from Hewitt and adjusted as necessary in the Committee's view to reflect, among other things, the relative financial and operating performance of the Corporation and its peer group companies." During the two-year Class Period here, total compensation for defendants Osborn, Waddell and Fradkin was approximately $25.3 million, $26.3 million and $10.2 million,

- 8 -

respectively. Together, the Individual Defendants' total compensation exceeded $60 million, all while they were disguising the true deteriorating nature of Northern Trust's loan portfolio.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

22.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Northern Trust. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Northern Trust common stock was a success, as it: (i) deceived the investing public regarding (a) the investment structure and revenue generating capacity of Northern Trust's securities lending program and (b) the status of its loan portfolio, which, in turn, allowed Northern Trust to overstate its earnings; (ii) artificially inflated the price of Northern Trust common stock; (iii) allowed Individual Defendants to sell over $22.5 million worth of their own Northern Trust stock at artificially inflated prices; (iv) allowed defendants to be paid millions of dollars in incentive awards based in part on Northern Trust's purported success; and (v) caused plaintiffs and other members of the Class to purchase Northern Trust common stock at inflated prices.

## BACKGROUND AND OVERVIEW OF DEFENDANTS'
## CLASS PERIOD MISCONDUCT

23.     Northern Trust, through its subsidiaries, provides asset servicing, fund administration, investment management, banking, and fiduciary solutions for corporations, institutions, and private clients worldwide. The Company's loan portfolio is comprised of residential and commercial real estate loans, commercial and personal loans, and lease financing solutions. The Company prides itself on providing an integrated approach to wealth management that includes personal trust, investment management, custody, and philanthropic services; financial consulting services; estate administration services; brokerage services; and private and business banking services, focusing on high net-worth individuals and families, executives, professionals, and established privately held

businesses. Northern Trust also provides securities lending services to corporate and public retirement systems, pension funds, endowments, foundations, insurance companies, and Employee Retirement Income Security Act ("ERISA") plans.

**Northern Trust's Securities Lending Program**

24.     Northern Trust initiated securities lending for its institutional clients in 1981. Since then Northern Trust has become one of the largest providers of such services and has consistently promoted its securities lending – to its clients and investors – as "a low risk value added product that has been a consistent source of incremental return for our clients over a long period of time." In essence, securities lending effects the temporary transfer of securities from the owner to a borrower in exchange for cash collateral or near-cash equivalents, such as government securities. And while Northern Trust, through client agreements, was charged with properly handling the risks of such transactions, it failed to do so.

25.     In the typical securities lending transaction, an agent for a security's owner negotiates a borrowing agreement with a potential borrower. The borrowing agreement sets the loan's terms and duration. Borrowers typically need securities to effect short sales (when they believe the borrowed security's market price will fall), hedging strategies to offset risk for long positions, and arbitrage opportunities when a security's price and value appear mismatched. The borrower commits to transfer collateral exceeding the lent security's value by a fixed percentage. The lending agent also negotiates a "rebate rate," which is a percentage of the invested collateral's market value. The "rebate" is ultimately returned to the borrower for use of the pledged collateral during the loan's pendency. The owner's lending or custodial account agent then reinvests the collateral, presumably under conservative, low-risk guidelines. The difference between the invested collateral's earnings and the rebate rate – the "spread," – is the gross revenue the client derives from the lending

- 10 -

transaction. From this amount, the lending agent's fees and other transaction costs are deducted. The remainder is the net earnings, which is credited to the client's account.

26. The lending transaction poses two significant risks to the owner. The first is borrower risk in which the borrower defaults and fails to return the borrowed securities. If the collateral is insufficient to replace the loaned securities, the owner suffers the loss. This risk is minimized by pre-screening borrowers and monitoring their credit risk and the loaned securities' daily market value. The second is investment risk or the risk that the reinvested collateral becomes impaired or decreases in value. This risk is minimized by establishing sound, conservative investment guidelines that cover, among other things, interest rate risk, credit quality, sector diversification, and security issuer and issued security exposures. Because the net earnings credited to the client's account were relatively modest, securities lending only made sense if investment risk was virtually non-existent.

27. The structure of Northern Trust's securities lending program was sophisticated, but the program's operation was seriously flawed – and those flaws went undisclosed to its clients and the investing public. The source of the securities for Northern Trust's lending program were so-called collective funds into which its institutional clients invested billions of dollars. These funds were typically benchmarked to indices, such as the Standard & Poor's 500 or the Lehman Brothers Aggregate Bond Index, providing a broad and predictable portfolio of readily lendable securities. The collective funds were also structured to permit securities lending. Through a client-authorized declaration of trust or investment manager agreement, NTI, a wholly-owned Northern Trust subsidiary, managed the collective fund and initiated the lending process. NTI appointed its affiliate and another Northern Trust subsidiary, NTC, to act as the lending agent for the securities lending transactions.

28. NTC entered borrowing agreements with purportedly pre-screened and committee-approved third-party borrowers seeking securities from the collective funds' portfolios. In exchange

- 11 -

for the loaned securities, NTC in turn received and held cash or other collateral equaling 102% to 105% of the securities' market value. A rebate rate was also set for the loan.

29. After NTC received the borrower's collateral, NTI directed that it be reinvested in specified funds referred to as collateral pools. The respective pools were purportedly designed to minimize risk. To that end, the collateral investments were to be short-term, high-quality and readily liquid. Beyond the goal of obtaining a consistent, safe return for clients, prudent and liquid investments were imperative to accommodate the lending program's operation as the borrowed securities could be recalled or returned to Northern Trust's clients at any time. This would require a prompt return of collateral and remittance of the rebate. So, too, the securities lending clients – and not Northern Trust – were responsible for collateral deficiencies, such as when the invested assets became irretrievably impaired. Clearly, the necessary balancing of the lending program demands required vigilant and conservative practices with substantial liquidity readily available. For its management of the securities lending program, Northern Trust received 40% of the invested collateral's returns.

**The Jeopardy to Northern Trust's Securities Lending Was Obvious from the Class Period's Outset – and Only Got Worse**

30. The very nature of Northern Trust's securities lending program made it particularly susceptible to market changes and disruption in the credit markets. Increasing illiquidity not only violated the collateral pools' stated objectives, it diminished Northern Trust's flexibility to respond to market changes impacting securities lending. Northern Trust maintained that it was on alert for such changes, but, in truth, it failed to heed obvious warnings from the financial market or its own economist.

- 12 -

31.     The landmarks to the unraveling mortgage market in early 2007 and their reverberation throughout the larger financial markets were profound at the time. Chief among them were:

- **February 2007**: The 2006 boom in U.S. housing prices abruptly reverses course; between 4Q 2005 and the 1Q 2006, median U.S. housing prices fall 3.3%. These declines accelerate in 2007. The downturn prompts a collapse of the U.S. subprime mortgage industry. More than 25 subprime lending firms declare bankruptcy in February and March 2007. The collapse rattles the Dow Jones Industrial Average, which loses 416 points, or 3.3% on February 27, 2007.

- **February 2007**: The Federal Home Loan Mortgage Corporation ("Freddie Mac") announces that it will no longer buy the most risky subprime mortgages and mortgage-related securities.

- **April 2007**: New Century Financial Corporation, the largest U.S. subprime lender, files for bankruptcy following a series of bankruptcies at smaller subprime lending firms. Analysts worry about the impact debt from subprime mortgages will have on the financial sector, which invested heavily in securitized debt from subprime loans.

- **June 2007**: Standard and Poor's and Moody's Investor Services downgrade over 100 bonds backed by second-lien subprime mortgages.

- **June 2007**: Bear Stearns, one of the largest investment banks in the United States, informs investors that it is suspending redemptions from its High-Grade Structured Credit Strategies Enhanced Leverage Fund.

- **July 2007**: Bear Stearns, announces two of its hedge funds have lost almost all of their investor capital and will file for bankruptcy. The bank previously attempted to use money from other parts of its operations to bail out the funds and halted redemptions, but the losses at the funds, which eclipsed 90% of original holdings, proved too large.

- **August 2007**: American Home Mortgage, the 10th largest retail mortgage lender in the United States, files for Chapter 11 bankruptcy protection.

- **August 2007**: Subprime mortgage problems span the globe as hedge funds and banks around the world reveal substantial holdings of mortgage-backed securities in their investment portfolios. France's BNP Paribas announces on August 9 that it cannot value the assets held by three of its hedge funds. Other European Union banks follow with similar announcements. The European Central Bank immediately steps in offering low-interest credit lines to these banks.

- **August 2007**: With lending markets drying up around the world, central banks coordinate to inject liquidity into credit markets. The United States Federal Reserve

- 13 -

("Federal Reserve"), the European Central Bank, and the Banks of Australia, Canada, and Japan all inject money. On August 15, Countrywide Financial, the largest mortgage lender in the United States, says foreclosures and mortgage delinquencies have risen to their highest levels since 2002.

- **September 2007**: Northern Rock, a British bank, requests emergency funds from Britain's central bank. A run on deposits at Northern Rock ensues, with large lines forming outside bank branches. In February 2008, Northern Rock will be placed in state ownership.

- **September 2007**: The Federal Reserve makes its first in a series of interest rate cuts, lowering the benchmark federal funds rate from 5.25% to 4.75%. By November 2008, the Federal Reserve will cut rates to 1%.

- **October 2007**: Swiss bank UBS announces it must write down $3.4 billion from subprime mortgage related investments, and cut 1,500 jobs. Citigroup similarly reveals that its subprime losses total approximately $1.3 billion in addition to $2.6 billion in extra credit costs.

- **October 2007**: Merrill Lynch CEO Stanley O'Neal resigns soon after Merrill Lynch unveils $7.9 billion in exposure to bad debt.

- **January 2008**: The National Association of Realtors releases data for 2007 showing the largest single-year drop in United States home sales in 25 years, increasing fears that more Americans will default on mortgage debt and other forms of debt, adding to credit market problems.

- **January 2008**: A major bond insurer, MBIA, announces a loss of $2.3 billion – its biggest to date for a three-month period – blaming its exposure to the U.S. subprime mortgage crisis.

- **February 2008**: Federal Reserve Chairman Ben Bernanke adds his voice to concerns about monoline insurers, saying he is closely monitoring developments "[g]iven the adverse effects that problems of financial guarantors can have on financial markets and the economy."

- **March 2008**: Bear Stearns announces major liquidity problems and is granted a 28-day emergency loan from the New York Federal Reserve Bank. Investors are fearful that the firm's collapse could spark a collapse of the financial sector. Two days later, JPMorgan Chase buys Bear Stearns for $2 per share (later increasing its bid to $10 per share). The bank had traded at a high of $172 per share about two months earlier. The collapse and sale of one of the most iconic institutions on Wall Street sparks broad fears about the future of the financial sector.

- **March 2008**: Carlyle Capital Corporation receives a default notice after failing to meet margin calls on its mortgage bond fund.

- **March 2008**: The FBI discloses that it has initiated a probe in the fraudulent mortgage practices at Countrywide Home Loans, Inc., one of the largest third-party subprime loan originators in the United States.

- **April 2008**: The International Monetary Fund, which oversees the global economy, warns that potential losses from the credit crunch could reach $1 trillion and possibly higher.

- **April 2008**: UBS acknowledges the need for $37 billion in cumulative write-downs, and its CEO Marcel Ospel abruptly resigns.

- **April 2008**: Royal Bank of Scotland announces a write-down of approximately $9 billion on the value of its investments between April and June – the largest write-off yet for a British bank, primarily attributable to credit market and mortgage-back securities exposures.

- **July 2008**: IndyMac Bancorp Inc., a prolific mortgage specialist that helped fuel the housing boom, was seized by the FDIC in what was the third largest bank failure in U.S. history. The Pasadena, California thrift had been one of the largest savings and loans in the country with about $32 billion in assets.

- **September 2008**: The government announces it will seize control of federal mortgage insurers Federal National Mortgage Association and Freddie Mac, in what was then considered Washington's most dramatic credit crisis intervention. The two firms are riddled by mortgage defaults, and federal regulators fear their collapse could lead to massive collateral damage for financial markets and the economy.

32. At each one of these landmarks, Northern Trust could have adjusted its practices to protect its securities lending clients and could have disclosed to investors the impact these events were having on the securities lending business. Northern Trust failed to do either, disregarding the looming disaster.

33. The market impact of these and related events has been cogently summarized – by Northern Trust:

> The troubles of 2007 morphed into a global financial crisis in 2008 as losses and asset write-downs continued. Financial institutions already struggling to raise new capital were forced to sell assets and reduce balance sheet leverage at the same time. As a result, trading desks of financial institutions, typically considered market makers in fixed income securities, found themselves without sufficient capital to buy and hold the securities investors wished to sell. This caused already dysfunctional short-term markets to rapidly grow more illiquid.

- 15 -

As 2008 continued, financial institutions known to have large exposure to real estate found it difficult to obtain funding, even at extremely high prices. Traditional counterparties became reluctant to lend to each other at any price as they felt unable to assess creditworthiness in an environment where asset prices continued to fall. This lack of counterparty confidence caused short-term interest rates to rise and become dislocated from central bank bases rates. The failure of Bear Stearns and its government-organised takeover by JPMorgan Chase highlighted how quickly an institution could fail when its traditional counterparties suddenly refused to provide short-term financing.

As the year progressed, market issues deepened. Central banks increasingly became the lender of last resort. Using traditional methods to stimulate lending and aid financial institutions, central banks reduced their base rates throughout the year. These efforts ultimately proved ineffective in halting the crisis. Real estate foreclosures increased and prices continued to fall, while virtually all financial institutions found financing expensive, despite lower base rates. Increasingly, central banks resorted to unconventional measures to provide financing when the markets refused.

34.     This summary is not simply hindsight surmise. Rather, it is a plain statement of the effect of 2007 and 2008 events and a validation of the earlier analysis and strong warnings of Paul L. Kasriel, Senior Vice President and Director of Economic Research at Northern Trust.

35.     One June 4, 2004, in a Northern Trust-published "Positive Economic Commentary," Kasriel likened the run-up in home values to pre-crash stock prices in 1999. Kasriel noted that as corporate debt rose at that time, deniers downplayed the risk because corporate debt compared to market value was actually falling. He concluded that should the housing price bubble go the same way as the corporate defaults in 2000 the result would be devastating as "U.S. commercial banks have a record 60% of their earning assets in mortgage-related obligations."

36.     And as if to put an exclamation point on his warning, Kasriel authored another "Positive Economic Commentary" on July 30, 2004, hypothesizing the grim consequences if the housing market collapsed. He concluded:

After the U.S. stock market bubble burst in 2000, there were massive corporate bankruptcies. U.S. banks were clever enough to offload a lot of their commercial credit risk to other parties before the bankruptcies occurred. Thus, the U.S. banking system was bloodied by the bursting of the late 1990s stock market, but

- 16 -

> unbowed.  Banks were willing to able to keep lending – if not to corporations, then to households with their homes as collateral.  All of which brings me to where I came in.  If the U.S. housing market goes bust, the U.S. banking system is likely to fall on very hard times as the value of all that housing collateral drops.

Apparently, Northern Trust saw no reason to heed the sound warning of its chief economist, choosing instead to suffer his predicted consequences.

37.     Nor could the consequences of the financial market disruption and its direct impact on securities lending be overlooked by Northern Trust and its NTI and NTC subsidiaries.  The market values of the collateral pools were scrutinized daily.  Indeed, one of the collateral pools, the NTGI-Collective Short Term Extendable Portfolio Fund ("STEP"), was a variable net-asset-value fund that had to be valued daily to reflect changing market prices.  Explaining STEP's reduced 1Q 2008 return to a client, Guy J. Sclafani, Vice President for NTGI, acknowledged in an April 9, 2008 email attachment:

> In recent months, the credit worthiness of a small portion of the ABS [asset backed securities] market – that backed by subprime mortgage loans – has come into question.  This led to a re-pricing risk for both specific sub-prime mortgage-backed issues as well as the financial firms that rely heavily on this market (lenders, mortgage brokers, investment banks, bond insurers, etc.).  The resultant widening of credit risks spreads on ABS extended across the financial services industry and drove a major reduction in the liquidity of these markets.  Prices on securities held by STEP have fallen dramatically in some cases, more because of the reduced liquidity than a reduction in creditworthiness.

38.     Further, Northern Trust managed its cash collateral investment internally.  The Short Duration Fixed Income team was responsible for that reinvestment and met weekly with the securities lending traders "to ensure the lending and collateral reinvestment teams work together to minimize interest rate or gap risks arising from mismatches between the loan and the collateral portfolios."  These efforts were further supported by Northern Trust's Fixed Income Research team that monitored "hundreds of U.S. and non-U.S. credits encompassing banks, corporations, finance companies, asset-backed securities, repurchase and swapped counterparties, and municipal entities."

The Fixed Income Research team continuously monitored nationally recognized rating organizations such as Moody's and Standard & Poor's. Additionally, this team maintained "contact with numerous rating agency analysts and brokerage analysts to supplement our independent credit determination process. Any credit downgrades are noted and communicated to portfolio managers." The Securities Lending Collateral Committee; drawing experience from credit risk, credit policy, risk oversight, and portfolio management analysts; also monitored the invested collateral for potential collateral deficiencies. The monitoring necessary to undertake collateral reinvestment and to assess collateral value necessarily made Northern Trust unavoidably aware of the headwinds that were blowing through its securities lending program in 2007 and 2008.

**Northern Trust Did Not Structure the Collateral Pools with Prudent Investments, Particularly in Light of the Known Financial Market Turmoil**

39.     Northern Trust's securities lending was driven by the promise of secure, short-term investments generating reasonable returns while maintaining the liquidity the lending program and market changes demanded. To reinforce that promise Northern Trust stated the collateral pools' investment objectives. For example, the NTGI-Collective Short-Term Investment Fund ("STIF") sought "to maximize current income to the extent consistent with the preservation of capital and maintenance of liquidity." STEP sought "higher returns than money market funds," but in "ultra short duration" investments.

40.     But during the Class Period, Northern Trust failed to manage the collateral pools prudently. Indeed, defendants repeatedly jeopardized the lending program by choosing longer-duration and riskier investments, such as asset- and mortgage-backed securities. By March 31, 2008, the largest 10 holdings in STEP had a weighted average maturity of 1.95 years. Thirty-three of the STEP holdings had maturities in the year 2030 and beyond. By August 31, 2008, that number had risen to 37. Similarly, by August 31, 2008, 33% of the Core USA Cash Collateral Fund ("Core

USA") had securities with maturation horizons of 97 days to three years. Another 1% exceeded three years. This amounted to $24.8 billion of invested collateral. Such maturities were grossly inconsistent with achieving liquidity.

41.     Northern Trust also chose the greater reward of more speculative investments over the clear Class-Period need for increased liquidity and reduced credit challenge. By as late as August 31, 2008, Northern Trust still had in Core USA over $666 million in subprime residential mortgage-backed securities – and tens of millions more in other asset- and mortgage-backed debt. In May 2008, STIF had 21.7% and 12.7% of its holdings, respectively, in the banking industry and mortgage-backed asset sectors, investment sectors that had already been faltering for some time. And by August 2008, Northern Trust had *increased* its STIF banking holdings to 29%.

42.     In a September 2008 securities lending client update, Northern Trust trumpeted the contribution of three holdings to STEP's performance through August 31, 2008. However, all of these contributors, CIT Group ("CIT"), Capmark Financial Group ("Capmark"), and iStar Financial Incorporated ("iStar"), had significant exposure to either the residential mortgage or the commercial mortgage and real estate sectors. Indeed, CIT sold off a residential lending division to brighten its performance – after over $1.7 billion in mortgage-related write-downs in 2007 and 2008 – but ultimately declared Chapter 11 bankruptcy in November, 2009. Nor were the bond ratings of these companies stellar. iStar and Capmark's ratings, for example, indicated they were "considered lowest investment grade" and the likelihood of repayment would be impaired by "adverse business or economic conditions." Notwithstanding the significant – and known – exposures in the STEP portfolio, Northern Trust at a September 17, 2008 update conference stated: "At this time, all of the securities held in STEP are expected to mature at par" and as this occurs, "we expect to recoup some of the unrealized losses suffered during the past year." At the time of the statement, the STEP assets

- 19 -

totaled $11.4 billion. By the end of the month, the fund had lost $2 billion and another billion by year end.

43. Northern Trust's collateral investments also ran to the exotic. By March 31, 2008, Northern Trust held over $330 million of Sigma Finance Corporation ("Sigma") securities, the tenth largest holding in the STEP portfolio. Sigma was a structured investment vehicle ("SIV") created by Gordian Knot, a London-based hedge fund, and was specifically designed to invest in certain asset-backed securities and related financial instruments. It purportedly profited when returns on its highly leveraged investments exceeded the cost of its funding through medium-term notes. Sigma's SIV model put it near the center of the credit market's disruption, and by April 4, 2008, Moody's significantly downgraded its credit rating. Moody's pegged its rating on "'continuing uncertainties surrounding Sigma's ability to absorb the heightened and unprecedented levels of stress in the credit markets, coupled with further deterioration in Sigma's asset prices.'"

44. Theta Finance Corporation ("Theta"), another Gordian Knot-created SIV and STEP holding, earned returns by buying bonds and selling credit-default swaps, a derivative that acted to protect bond holders against the issuer's default. During the Class Period, Theta's bond portfolio included credit-card debt, bank obligations, mortgage-backed securities and other collateralized loan obligations. Much like Sigma, Theta was highly scrutinized regarding its practices and the "'significant deteriorization' in its holdings." Notwithstanding the clear warnings regarding these SIVs, Northern Trust did not attempt to remove them from the collateral pools. Instead it sought to calm its clients, assuring privately that "the underlying high credit quality of the STIF/STEP assets will result in a gradual appreciation in value of the collateral pool." And in Mr. Sclafani's August 9, 2008 client email attachment, he further noted, Northern Trust remains "confident in the appropriateness of the STIF/STEP strategy but we also remain vigilant with regard to overall market developments. Again, at this time, we expect all of the securities held in STEP to continue to

- 20 -

perform and pay in full at maturity." Less than five months later – and well before maturity – Northern Trust deemed its Sigma and Theta holdings "permanently impaired" and incurred hundreds of millions of dollars as a charge to support the collateral pools.

45. The collateral funds also held Lehman Brothers Holdings, Inc. ("Lehman") securities. And like Sigma and Theta, these holdings, too, were deemed "permanently impaired" in September 2008. In recounting the circumstances of Lehman's default, Northern Trust characterized Lehman's September 15, 2008 bankruptcy filing as unprecedented and unanticipated. However, Northern Trust did not need to foresee a complete financial collapse to clearly see that Lehman's debt securities were troubled from the Class Period's outset.

46. Lehman was one of the largest issuers of mortgage-backed securities and attained that position by the early 2000's. To fuel the demand for its securitized transactions, Lehman purchased two mortgage lenders, Aurora Loan Services, LLC ("Aurora") and BNC Mortgage ("BNC"). Aurora originated mostly Alt-A mortgage loans, that is, loans the risk of which lies between prime and subprime. BNC focused on underwriting subprime mortgages. By 2007, Lehman had securitized $480 billion in mortgages, with Aurora originating one-third of the securitized loans and BNC originating slightly less than a quarter.

47. As housing prices began their decline in 2006 and through 2007, adjustable-rate mortgages and interest-only mortgages began to reset at higher rates. Mortgage delinquencies resulted, and the subprime mortgage crisis gained speed. BNC suffered substantial losses in 2007, and just before the Class Period's beginning, Lehman shuttered BNC costing it approximately $20 million after taxes. In January 2008, Lehman announced it would cease wholesale mortgage lending in the United States. In March 2008, Standard & Poor's downgraded Lehman's debt to negative amid expectations of steep revenue losses. Moody's and Fitch soon followed with similar rating downgrades. Less than two months later, and after a year-to-date 61% slide in Lehman's stock price

- 21 -

and an announced 2Q 2008 $2.8 billion loss, Moody's changed Lehman's A1 rating to negative. Moody's also placed Lehman on review for further possible downgrading. Lehman followed this ratings blow with the announcement that $4.1 billion in gross write-downs would be needed, a loss that was noted to exceed even pessimistic forecasts. Lehman's revenue for that quarter had also fallen to a negative $668 million. In June 2008, both Fitch and Standard & Poor's again downgraded Lehman, and a UBS analyst noted that Lehman still had "a lot of exposure to the mortgage market, and they are going to need capital to get through it." In July 2008, Moody's downgraded the long-term senior rating of Lehman Brothers from A1 to A2, reflecting an expectation for further mark-to-market losses in Lehman's residential and commercial mortgage portfolio. Moody's senior Vice President, Blaine Frantz, stated in a press release that, despite the company's efforts to cut its commercial and residential real estate exposure, "Lehman's mortgage exposures and concentrations remain high and have weighed heavily on the firm's operating results and market confidence."

48.     Not surprisingly, Lehman's hedge fund clients began withdrawing large amounts of money. On September 10, 2008, Lehman pre-announced a $3.9 billion 3Q 2008 loss in addition to a $7 billion write-down of mortgage-related holdings. Demand for additional collateral to cover Lehman's lending positions soon followed, with JPMorgan Chase & Company requesting an additional $5 billion. All of these warnings were written large in the financial market and while Northern Trust, itself, did not hold Lehman debt or securities, its clients and the collateral pools did.

49.     As losses were realized in the collateral pools from impaired securities and the clients' flight from the securities lending program, the lending program's participants suffered real losses. So, too, did investors who had purchased Northern Trust securities at inflated prices because Northern Trust's failed management of the securities lending program went undisclosed.

**Northern Trust Profited from Its Imprudent Collateral Pool Investing – At Least Until Its Imprudence Was Revealed**

50.     Northern Trust's securities lending fees related directly to the collateral pool's return. The larger the investment return, the larger Northern Trust's 40% take. This fee plan created a conflict between Northern Trust's self-interest and its fiduciary obligations. During the Class Period, Northern Trust's self interest won out, as collateral investments crept into higher return, but longer-term and higher-risk securities. Market dynamics made the return on, for example, risky asset-backed securities far more attractive than government treasury bonds. This attraction misdirected Northern Trust's lending program investment scheme, allowing, for example, hundreds of millions of dollars of mortgage-backed securities into the collateral pools even as the collapse of the subprime mortgage market became increasingly obvious – and unavoidable.

51.     The following chart demonstrates the run-up in Northern Trust's securities lending fees, exclusive of STEP's contribution.[1]

| Northern Trust Securities Lending Fees (in millions) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2Q 2007 | 3Q 2007 | 4Q 2007 | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | 1Q 2009 | 2Q 2009 | 3Q 2009 | 4Q 2009 |
| Securities Lending Fees | 73.4 | 33.0 | 55.1 | 31.9 | 149.9 | (4.6) | 44.2 | (7.9) | 172.5 | 82.0 | 90.1 |
| Mark-to-Market Adjustment ("MTM") | 0.0 | (36.0) | (46.0) | (93.0) | 25.0 | (96.0) | (44.0) | (52.0) | 129.0 | 57.0 | 70.0 |
| Securities Lending Fees, excluding MTM adjustment | 73.4 | 69.0 | 101.1 | 124.9 | 124.9 | 91.4 | 88.2 | 44.1 | 43.5 | 25.0 | 20.1 |

---

[1]     Unlike the other collateral pool funds, STEP was a variable net-asset-value fund that required mark-to-market adjustments in the fund's value. Both company representatives and securities analysts looked to the securities lending fees absent STEP's mark-to-market adjustment as a better indicator of the quality of Northern Trust's securities lending revenue.

- 23 -

| Year-Over-Year % Increase of (Decrease)* | 20.53% | 69.95% | 142.45% | 173.90% | 70.16% | 32.46% | -12.76% | -64.69% | -65.17% | -72.65% | -77.21% |
| Quarter-Over-Quarter % Increase or (Decrease)* | 60.96% | -5.99% | 46.52% | 23.54% | 0.00% | -26.82% | -3.50% | -50.00% | -1.36% | -42.53% | -19.60% |
| * Percentage comparisons are based on securities lending fees unadjusted for the mark-to-market impact. | | | | | | | | | | | |

52.     But even as Northern Trust's fees increased, losses mounted as invested assets devalued and became impaired.  These losses, however, remained unrealized as sales of devalued collateral pool assets were avoided and the degree of collateral impairment went unstated.  Indeed, Northern Trust repeatedly promised that the unrealized losses would dissipate at the investment's maturity.  For example, during an October 17, 2007 analyst conference call, Fradkin stated:

> We do not believe at this time that there exist any permanent impairment of any holdings.  All of the asset markdowns recorded in the fund during the third quarter are unrealized and we expect, given what we know [,] that all of the fund's holdings will mature at par as expected.

53.     And even as Northern Trust had to acknowledge the mortgage market's unraveling and credit market travail – at least privately to important securities lending clients – it nevertheless encouraged continued participation by assuring the collateral pool's recovery:

> Our view is that the global credit contagion brought on by sub-prime mortgage lending has impacted the liquidity and pricing of high quality investments. Global Central Banks are actively engaged in providing liquidity to the global marketplace and adjusting monetary policy accordingly.  This adjustment process towards a more normal environment is likely to take a number of months and it is likely that higher liquidity premiums will exist for some time.  However, we expect that the underlying high credit quality of the STIF/STEP assets will result in a gradual appreciation in value of the collateral pool . . . .  Again at this time, we expect all of the securities held in STEP to continue to perform and pay in full at maturity.

54.     Faced with the grim reality of troubled collateral pools' assets and increasing credit market disruption and dislocation, Northern Trust failed to mitigate the collateral pools' mounting unrealized losses.  Northern Trust's inaction was, of course, a greater burden on its securities lending

- 24 -

clients than Northern Trust itself, as the clients were obligated to underwrite and remedy collateral deficiencies. Beyond this excused responsibility, Northern Trust had another – and pressing – reason to avoid mitigation. As volatility in the broader financial markets increased and security issuers' status became uncertain, liquid assets came at a premium. And that premium increased with market disruption. At the same time, central banks around the world were decreasing interest rates in order to invigorate lending, support financial institutions and put credit markets back on track. In the United States, for example, the Federal Funds rate, decreased from 4.75% at the Class Period's beginning to nearly 1.5% by the end of September 2008. Accordingly, liquid assets did not only cost more, their return became less as interest rates continued to fall. And while increased liquidity would allow Northern Trust to better respond to the market forces hammering the collateral pools, managing toward liquidity would come at a very high cost. As Michael Vardas, a Managing Director overseeing Global Securities Lending, stated at an institutional client conference in early 2009, liquidity "is an expensive insurance policy to purchase with rates at zero."

**Northern Trust Charged Its Securities Lending Clients for the Losses It Caused**

55.     In September 2008, as collateral pool losses had to be realized, Northern Trust informed its securities lending clients that they, not it, would be responsible for those losses. Starting on or about September 21, 2008, Northern Trust told securities lending participants that its Securities Lending Collateral Committee had declared a collateral deficiency as of September 19, 2008. The Committee did so to recognize the permanent impairment of the Lehman, Sigma and Theta assets and the devalued collateral held in five collateral pool funds. Thereafter, Northern Trust redirected money from the clients' collective fund holding to offset the deficiency. Northern Trust also moved the permanently impaired assets to a sub-fund and booked a payable against its clients' respective accounts for the remaining pro rata share of the collateral deficiency.

595068_1

56.     To staunch client flight from the securities lending program – and the realization of even more loss – Northern Trust restricted client withdrawal, requiring that clients take an in-kind distribution of collateral pool assets equal to their pro-rata share of the collateral pool. This exposed clients to the continuing downturn in Northern Trust's ill-conceived and illiquid collateral investments. For some, this effected a potential exposure that they had not previously faced. Not surprisingly, withdrawals slowed, but claims of breached fiduciary duty and violations of ERISA proliferated as aggrieved clients filed lawsuits around the country.

**Northern Trust Was Finally Forced to Reveal the Failed Conduct of Its Securities Lending Program**

57.     On September 17, 2008, Northern Trust issued an SEC Form 8-K report acknowledging impairment from Lehman's September 15, 2008 bankruptcy filing. The report further stated that Lehman had been a borrower of securities under Northern Trust's securities lending program and that the collateral pools held both short- and long-term Lehman fixed income securities. Northern Trust further stated that while its clients had exposure to Lehman securities, the Company did not. Five days later in a follow-on press release, Northern Trust quantified its clients' Lehman exposure in comingled fixed income funds – including the collateral pools – at $821 million.

58.     On September 29, 2008, Northern Trust announced it planned to take a pre-tax charge of approximately $525 million in 3Q 2008 to support various funds and to buy back illiquid auction rate securities. Without expressly acknowledging the September 19, 2008 collateral deficiency, the Company stated:

> Northern Trust also will take certain actions to provide support for securities lending clients whose cash collateral is invested in five constant dollar, commingled investment pools negatively impacted by recent market events. Northern Trust expects to incur a pre-tax charge of approximately $150 million ($94 million after-tax or $0.42 per share) in the third quarter in connection with this action.

- 26 -

The securities lending "support" was increased to $168 million by quarter end.

59.     Following this release, Northern Trust's stock price fell 18.81% to $64.88, a statistically significant change from the previous day.  The announced "support" for the securities lending program was necessitated by and a direct cause of the risky, imprudent and illiquid collateral investments Northern Trust effected during the Class Period.  Northern Trust's misrepresentations and failure to disclose the on-going and ultimately unavoidable consequences of its securities lending misconduct left investors in Northern Trust's stock unaware of its failed securities lending practices and that the Company's stock price was trading at an artificially inflated level.

60.     At a January 28, 2009 Citi Financial Services Conference, Fradkin recapped Northern Trust's securities lending program and discussed the changes needed to reinvigorate the program:

> We're looking at it from the clients' side, so what are the clients willing to put into the lending program.  And I think that will change because of the way the investments, the collateral, is going to be managed is also going to change. Basically, *there's going to be a lot less risk in these programs going forward*.  And that will then impact how we and others get paid for acting as the agent in these programs.

For Northern Trust investors, this stated change, though frank in its admission, was too little and too late.

61.     In the wake of the steep losses suffered by securities lending participants, the SEC held a public roundtable in 2009 to explore enhanced investor-oriented oversight of the industry.  In her opening remarks, SEC Chairman Mary L. Schapiro said:

> For a long time, securities lending was regarded and described as a relatively low risk venture, but the recent credit crisis revealed that it can be anything but low risk.  This was particularly the case with cash collateral reinvestment programs which experienced unanticipated illiquidity and losses.  Some institutions that lent their securities, and the beneficiaries relying on those institutions, were significantly harmed.

- 27 -

62. On September 29, 2009, *The Wall Street Journal* published an article entitled "SEC Weighs New Rules for Lending of Securities," which looked back at the experience of securities lending participants during the Class Period:

> The opacity of the securities-lending market worries regulators on several counts. The lack of transparency in the market has some people concerned that certain market participants could take on big risks that could threaten the financial system.

> Another issue is how securities lenders invest the cash collateral put up by borrowers. The lenders are typically large institutional investors such as pension plans and mutual funds. They work through agents that act as middlemen between lender and borrower.

> Last year's credit crunch exposed cases in which investors' agents placed collateral into risky pools of securities that had big losses. That spurred lawsuits by investors against agents. In some cases, the declines have been so severe that they undermined years of profits. The California Public Employees' Retirement System reported last month a loss of $634 million for its securities-lending program in the year ended in March.

> Wilshire Consulting said that figure could end up as high as $1 billion, wiping away much of the $1.4 billion that Calpers has earned from this since its inception more than 20 years ago.

> "We are in the process of developing new policies to reduce risk and losses in the program's reinvestment of collateral cash," said Calpers spokesman Brad Pacheco.

> Fearing further losses, many investors tried to terminate securities-lending programs last year. That led banks with some of the biggest securities-lending programs, including Northern Trust Corp., State Street Corp. and Bank of New York Mellon Corp., to impose restrictions on the ability of investors to withdraw assets from these programs.

> The SEC is looking into whether agents gave lenders complete information about the terms of the collateral investment.

**Northern Trust's Impaired Loan Portfolio**

63. Defendants promoted a culture at Northern Trust so focused on customer satisfaction that Northern Trust employees are renowned – and handsomely rewarded – for their energetic efforts to please. This tact sets Northern Trust's approach to lending well apart from that of typical banking

- 28 -

institutions. Lending at Northern Trust is not viewed as a separate line of business but as a tool to support its current client base and to attract new fee-based business. This relationship lending is targeted at clients most likely to seek a full range of financial services. Moreover, as Northern Trust does not engage in traditional banking products, such as retail banking, credit cards and consumer lending, the Company's lending strategy must carry client acquisition. Northern Trust, for example, may offer a wealthy individual a mortgage to buy a Florida vacation home simply to win the client's fee-based trust and estate planning business.

64. Both before and during the Class Period, defendants sacrificed loan quality by originating riskier loans, such as adjustable-rate or second-home mortgages to maintain its client base. Defendants further concentrated Northern Trust's loan portfolio in real estate markets that were already showing signs of overheating, such as in Illinois, Florida and Arizona – all states with sharp increases in housing prices and, historically, high rates of defaults and foreclosures. These circumstances required that Northern Trust's loan loss reserves be stronger than would otherwise be the case absent these circumstances.

65. During the Class Period, defendants repeatedly trumpeted Northern Trust's strong financial statements and its conservative management practices and policies, while failing to record adequate and timely loan loss reserves in its loan portfolio. Although investors recognized the general risks of the loans in deteriorating real estate markets, defendants assured that Northern Trust's loan portfolio was "exceptional" and "extremely clean." Fully aware of the inherent risks in many of the Company's loans, defendants hid the mounting losses and known risks of the Company's lending business from investors. As the market worsened, defendants were forced to disclose that its loan assets had been overvalued and under-reserved.

66. Beginning in January 2009, defendants began to hint at the problems in Northern Trust's residential and commercial real estate loan portfolio. Nonetheless, investors remained

- 29 -

unaware of the extent and the magnitude of the Company's loan impairments due to defendants' denials and continued misrepresentations about the loan portfolio's health. As a result, Northern Trust's stock continued to trade at artificially inflated prices.

67.     Ultimately, at the Class Period's end, Northern Trust substantially increased its loan loss reserve, from 0.57% of its total loans as of October 31, 2007 to 1.09% of its loans as of October 31, 2009. Its reserve ballooned from $143.2 million at the end of 3Q 2007 to $307.8 million by the end of 3Q 2009. Likewise Northern Trust's provision for credit losses greatly increased to $215 million in 2009, *a nearly twelve-fold increase* since 2007. Further, defendants acknowledged that its net charge-offs and nonperforming assets had also increased radically. Charge-offs, net of recoveries, jumped from $2 million for 3Q 2007 to $46.1 million in 3Q 2009 – an increase of *over twenty-three* times. And its nonperforming assets associated with Northern Trust's portfolio similarly jumped from $29.3 million to $301.5 million for the same time period.

68.     Northern Trust's reserve and provision for credit losses remained elevated through the end of 2009 and into 2010 as the Company was forced to recognize losses from the risky loans it originated, in large part, during the Class Period.

### DEFENDANTS' CLASS PERIOD MISREPRESENTATIONS AND THE SLOWLY EMERGING TRUTH REGARDING NORTHERN TRUST'S SECURITIES LENDING PROGRAM AND FALSE FINANCIAL STATEMENTS

69.     On October 17, 2007, Northern Trust issued a press release reporting its third quarter 2007 financial results. The release reported net income per share of $0.93. Net income increased 27% to $208.3 million. Northern Trust's third quarter consolidated revenues reached $892.5 million. Trust investment and other servicing fees from Corporate & Institutional Services ("C&IS") increased to $282 million. Securities lending fees totaled $33 million, down 19%. In addition, the release reported the Company's reserve for credit losses at September 30, 2007 was $154.5 million,

- 30 -

with a provision for credit losses for the third quarter of $6 million. The release further provided in pertinent part:

> William A. Osborn, Chairman and Chief Executive Officer, commented, "We are very pleased to report record earnings per share for the quarter, up 26% over last year. This performance represents our eleventh consecutive quarter of double-digit growth in earnings per share. Our results were driven by excellent revenue growth, including a 16% increase in trust, investment and other servicing fees, and record levels attained in foreign exchange trading income and net interest income. This record performance was achieved in the context of volatile third quarter markets. Our success in the marketplace was evidenced by double-digit growth in client assets, with assets under custody increasing 24% over last year to $4.1 trillion, global custody assets growing 31% to $2.0 trillion, and assets under management increasing 14% to $761.4 billion. Business momentum continues to be strong, we are investing aggressively on a global basis to serve the growing and complex needs of our clients, and our balance sheet continues to reflect outstanding asset quality and capital strength."

70.    After issuing its third quarter 2007 financial results, Northern Trust hosted a conference call for analysts, media representatives and investors on October 17, 2007, during which defendant Fradkin represented the following:

> Institutional investment management fees increased 2% or $1 million on a sequential quarter basis. Managed assets for institutional clients equaled $615 billion at September 30, up 14% or $75 billion from last year and down 1% or $8 billion sequentially. The sequential decline primarily reflects a lower level of securities lending collateral reflective of the deleveraging phenomenon that occurred during the third quarter as a result of the challenging fixed income environment. C&IS securities lending fees equaled $33 million in the third quarter representing a decrease of 19% or $8 million compared with last year's third quarter and a decrease of 55% or $40 million compared with the record $73 million that we posted in the seasonally strong second quarter of 2007. Securities lending collateral equaled $284 billion at September 30, up 14.5% or $36 billion versus one year ago and down 5% or $16 billion compared with June 30.
>
> Now let me pause for a moment and provide some perspective around our securities lending results in the third quarter. ***Securities lending is a low risk value added product that has been a consistent source of incremental return for our clients over a long period of time***. The credit market environment in this year's third quarter had a negative impact on securities lending results that we're reporting today.
>
> In return for the lent securities, borrowers provide collateral typically in the form of cash equal to 102 to 105% of the borrowed amount. The lender of the securities pays the borrower a rate of return on their cash collateral called a rebate

rate which generally floats with the Fed federal funds rate. On behalf of our clients who have lent their securities to approved borrowers we invest their cash collateral in a variety of investment pools. Our clients select which investment pools they would like to have their cash collateral invested in depending on their return objectives and risk tolerance. ***Investment options available to our clients for their securities lending collateral span a risk/reward continuum of short duration investment management products***.

*    *    *

During the third quarter we recorded a loan loss provision of $6 million compared with the provision of $6 million in the third quarter of last year and $4 million in the second quarter of this year. The majority of our loan loss provision this quarter reflects loan growth as average loans increased 12% year-over-year and 3% sequentially. Nonperforming assets totaled $29 million at quarter end down $3 million from $32 million at June 30, and equaled only 12 basis points of total loans on September 30. We recorded $2 million in net charge-offs during the third quarter.

*    *    *

***We also have excellent loan quality, a hallmark of Northern Trust's relationship lending strategy for many years***. Our relationship lending strategy consistently applied across the years means that we do not provide bridge financing on private equity or leverage buyout deals. Nonperforming assets actually declined in the third quarter and represented a minimal 12 basis points of loans a figure that historically rates among the best of the largest banks in the United States. In addition, we do not have any off balance sheet commercial paper conduit facilities.

71.    Between October 17, 2007 and October 30, 2007, Northern Trust's stock price increased from $69.26 per share to more than $74.00 per share.

72.    On October 30, 2007, Northern Trust filed a Form 10-Q with the SEC for the third quarter of 2007, which included the same financial results as previously reported in the October 17, 2007 release. The Form 10-Q was accompanied by a certification signed by defendant Osborn, which stated:

I, William A. Osborn, Chief Executive Officer of Northern Trust Corporation, certify that:

1.    I have reviewed this report on Form 10-Q for the quarterly period ending September 30, 2007 of Northern Trust Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

- 32 -

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

73.     Defendant Fradkin signed a nearly identical certification included in the Form 10- Q.

74.     On November 8, 2007, Northern Trust attended the BancAnalysts Association of Boston Conference with analysts and the media, during which defendant Fradkin represented the following:

> ***Our focus and conservativism is also evident in the longstanding consistent and prudent strategies we've utilized in the management of our balance sheet***. Within our portfolio, fully 96% of securities carried a AAA rating as of September 30. We also operate conservatively on the short end of the yield curve. . . . Ours is a high-quality, short-duration securities portfolio. We are not taking considerable credit risk. We are not taking considerable interest-rate risk. And we are not betting on the curve and its future direction.
>
> ***Likewise, pristine credit quality remains a hallmark of Northern Trust. Our non-performing assets actually declined in the third quarter on both a year over year and sequential quarter basis***. Non-performing assets as a percent of total loans equals only 12 basis points, less than one-fifth the level of the top 20 banks on average. A never-ending focus on clients, as I discussed earlier, and serving them with distinction is another hallmark and core strategy of Northern Trust.
>
> *                *                *
>
> The question relates to our loan quality, and whether there are any specific geographies or segments that we are concerned about.
>
> You know, we are always concerned about everything. That's the paranoia in this. I think the good news is this – our strategy is really, with respect to the loan portfolio, in particular on the personal side of our business, is built around, again, a comprehensive relationship. So we don't have bankers just running around, trying to make loans. We make loans to people with whom we are doing other things. And we tend to know quite a bit about those people.
>
> That said, you know, in speaking of cycles, the cycle on credit quality has been very, very good for quite some time, and it can only get so good. So is our antenna up? Yes, every quarter we talk about the quality of our loan portfolio, and it is outstanding, but it won't stay there forever. You can't lend money, even to the people we're lending to, and never have an event. ***But we think we have the risk controls and the balances and we've managed the concentrations well***.

- 34 -

I think the one thin[g] you have to remember with the Northern Trust, if one loan goes bad, literally one loan, you'll see a spike at quarter end, and, you know, people will say "Oh my god, $10 million" or something, but that's all it would be.

*So, we are vigilant about the environment. Clearly, it is changing, and I think you're seeing that in the results that most banks are putting up and we're not above that. But we feel good about the way we've managed it thus far.*

75.     On November 14, 2007, Northern Trust attended the Merrill Lynch Banking and Financial Services Investor Conference with analysts and the media, during which defendant Osborn represented the following:

And during this period – and Steve knows this and I think the market knows this – we don't take on due risk. And some of you are from Chicago here. *We are not known as a big risk taker*. And candidly in today's market, that's obviously served us quite well.

Our strategies are not only focused, but they are consistent and conservative. We've managed our balance sheet effectively, and our securities portfolio – 96% of our securities are rated AAA, and the remainder of 4% are AA rated securities. So we again, we're sort of on the short end of the yield curve, and we – so everything we do re-prices relatively quickly. It's our philosophy, don't take risk with the balance sheet. We're trying to build a fee based business. So we're not trying to look to take extra risk there.

And also if you look at our credit portfolio, the lending portfolio we have, we have about $24Â billion of assets. Actually non-performing assets at the end of the third quarter declined. And we have our non-performing asset ratio is 12 basis points. *And we cover our reserve coverage of the non-performing assets by I think over five times. It's a pretty large number. So we really have maintained the right kind of focus on credit quality in the organization*.

76.     By late November 2007, these positive statements had caused Northern Trust's stock price to exceed $80 per share.

77.     On January 16, 2008, Northern Trust issued a press release reporting its full year and fourth quarter 2007 earnings results. The release reported net income per common share of $0.55 and net income of $125.0 million for the fourth quarter. The release further reported fourth quarter consolidated revenues reached $972.8 million. Trust investment and other servicing fees from the Company's C&IS segment was $314.6 million, which included $55.1 million derived from Northern

- 35 -

Trust's securities lending program. In addition, the release reported the Company's reserve for credit losses at December 31, 2007 was $160.2 million, with a provision for credit losses for the fourth quarter of $8 million. The release further provided in pertinent part:

> Frederick H. Waddell, President and Chief Executive Officer, commented, "Our focused business model continued to generate excellent results in the fourth quarter amidst a challenging capital and credit market environment. Record operating earnings for the quarter and full year were driven by strong growth in trust, investment and other servicing fees, foreign exchange trading income, and net interest income, *while the quality of our loan portfolio continued to be exceptionally strong*.

> Northern Trust's success in the marketplace was evidenced by double-digit growth in client assets, with assets under custody increasing 17% to $4.1 trillion, global custody assets growing 23% to $2.1 trillion, and assets under management increasing 9% to $757.2 billion, versus last year. We enter 2008 in excellent financial condition with a continued focus on serving the needs of personal and institutional clients."

78. After issuing its fourth quarter and full year 2007 financial results, Northern Trust hosted a conference call for analysts, media representatives and investors on January 16, 2008, during which defendant Fradkin represented the following:

> Securities lending collateral equaled $270 billion at year end up 9% or $22 billion versus one year ago and as I mentioned earlier, down 5% or $14 billion compared with September 30. The sequential decline primarily reflects a continuation of the deleveraging phenomenon that occurred in the third quarter, which was another out growth of heightened risk aversion in the challenging fixed income environment.

> \* \* \*

> *Credit quality remained exceptionally strong at year-end, with non-performing assets equal to only $29 million, down $8 million or 21% from a year ago*, and unchanged from September 30. Non-performing assets equaled only 12 basis points of total loans at year-end. During the fourth quarter, we recorded a loan loss provision of $8 million, compared with a provision of $2 million in the fourth quarter of last year and $6 million in the third quarter of 2007. The majority of our loan loss provision in the fourth quarter reflects growth in our commercial loan portfolio.

> \* \* \*

- 36 -

[ANALYST:] Okay. And then the second question I had, Steve, you've obviously heard and read about a lot of the problems other institutions are having down in Florida. I know that your business is very different, but I wondered if you could share with us maybe some of the trends that you're seeing in your loan book down there and is that perhaps why you added so aggressively to the loan loss provision or the loan loss reserve for the quarter?

[FRADKIN:] Well, let me just start with the loan loss – the provision which was an $8 million provision, that was not linked in any specific way to anything in Florida. That was driven by growth if the commercial loan portfolio. No linkage there. I would say when we look at Florida more generally, our fees in Florida were $53 million in the fourth quarter. They were up 8% year-over-year and a point sequentially. Our new business in Florida in the fourth quarter was very strong and more than double what we did in the fourth quarter the year before. So the Florida business continues for us to be excellent and growing.

*     *     *

[ANALYST:] And that was my second question, which is can you just walk us through the loan growth, where you're seeing it? Is it geographically diverse, is it product specific? What are you seeing there?

[FRADKIN:] We have had very good growth on the commercial front. We've had good growth on the personal front. It's actually pretty broad-based, Ken, I would say. ***So the loan portfolio for us has been extremely clean***. As you know, our philosophy has been to be a relationship lender to those clients that fit our credit standards and our success on the loan portfolios is quite broad. But I guess the driver would be the commercial, the personal, and some of the activity we have internationally

79.    On February 28, 2008, Northern Trust filed a Form 10-K with the SEC for the full year and fourth quarter of 2007, which included the same financial results as previously reported in the January 16, 2008 release. The Form 10-K was accompanied by certifications signed by defendants Waddell and Fradkin, substantially identical to the certification quoted above.

80.    On April 15, 2008, Northern Trust issued a press release reporting its first quarter 2008 earnings results. The release reported earnings per share of $1.71, net income of $385.2 million and consolidated revenue of $1.15 billion for the first quarter. The release further reported trust, investment and other servicing fees from the Company's C&IS segment of $298.4 million, which included $31.9 million derived from Northern Trust's securities lending program. In addition,

- 37 -

the release reported the Company's reserve for credit losses at March 31, 2008 was $177.8 million,

with a provision for credit losses for the first quarter of $20 million. The release further provided in

part:

> Frederick H. Waddell, President and Chief Executive Officer, commented, "We are pleased to report record earnings for the quarter. The strong results were achieved in a very difficult economic environment for financial institutions and demonstrate the continued success of our focused business strategy. Record operating earnings for the quarter were driven by excellent growth in trust, investment and other servicing fees, foreign exchange trading income, and net interest income.

81.     After issuing its first quarter 2008 financial results, Northern Trust hosted a

conference call for analysts, media representatives and investors on April 15, 2008, during which

defendant Fradkin represented the following:

> C&IS securities lending fees equaled $32 million in the first quarter, representing a decrease of 30%, or $14 million compared with last year's first quarter, and a decrease of 42%, or $23 million, compared with the fourth quarter of 2007. Securities lending collateral equaled $267 billion at quarter end, down 10%, or $30 billion versus one year ago, and down 1%, or $2 billion compared with December 31. The year-over-year decline reflects the deleveraging phenomenon that occurred during the second half of 2007, as well as lower equity market values.

> As we did in the third and fourth quarters of last year, let me pause for a minute and provide some prospecting around our Securities Lending results in the first quarter. Similar to our experience in the second half of last year, our Securities Lending results in the first quarter were adversely impacted by the on-going disruption in the credit environment, particularly during the month of March.

> It is important to note however that there were very positive offsets in our Securities Lending business during the first quarter, including strong demand for Treasury Securities, and the Federal Reserve's continued easing of the Federal Funds rate by 300 basis points since September of 2007. This noted, the unusually high level of credit market dislocation, once again negatively impacted the returns achieved in the one mark to market cash collateral investment fund used for Securities Lending.

> As of March 31, approximately 5% of our $267 billion in Securities Lending cash collateral, was invested in our client selection and direction in this total return short duration Fixed Income Fund. As I mentioned last quarter, this is our only meaningful fund that is structured as a mark to market fund, and understanding this

designation is essential to understanding the impact during the first quarter, just as occurred in the third and fourth quarters of 2007.

*     *     *

As I did in the last two quarters, let me end this discussion of our Securities Lending performance by providing you with a perspective on what our results would have been, had this collateral been invested in our most commonly used Securities Lending collateral fund. This comparison illustrates the magnitude of the impact that mark to market accounting can have in the current environment.

Again for the purposes of illustration, our Securities Lending results in the first quarter, would have been $93 million higher, than the $32 million fee amount that we reported, had the clients in the mark to market fund, been invested in our most commonly used pool. Therefore, we would have reported year-over-year fee growth in Securities Lending of 174%, as opposed to our actual reported decline of 30%.

*     *     *

***Credit quality remained exceptionally strong at quarter end, with nonperforming assets equal to only $36 million, down $1 million, or 3% from a year ago***.

Nonperforming assets increased on a sequential quarter basis by $6 million, reflecting the addition of three small loans to nonperforming status, offset by the payoff of one nonperforming loan. Nonperforming assets equaled only 13 basis points of total loans at quarter end. During the first quarter we recorded a loan loss provision of $20 million, compared with no provision in the first quarter of last year, and an $8 million provision in the fourth quarter of 2007.

Approximately 40% of the $20 million provision reflects strong commercial loan growth this quarter. Another 30% of the provision reflects our decision to increase the credit loss reserve, to reflect the weakening economic environment. The remainder reflects current quarter net charge-offs of $2.4 million, and a credit rating downgrade on two additional exposures.

82.    On May 5, 2008, Northern Trust filed a Form 10-Q with the SEC for the first quarter of 2008, which included the same financial results as previously reported in the April 15, 2008 release. The Form 10-Q was accompanied by certifications signed by defendants Waddell and Fradkin, substantially identical to the certification quoted above.

- 39 -

83.     On May 28, 2008, Northern Trust hosted its 2008 investor day conference call for analysts, media representatives and investors, during which defendant Fradkin represented the following:

> *Next I want to turn your attention to our continuing exceptional credit equality, which is a hallmark of the conservative and relationship based lending strategies that we deploy*.  Depicted here are three key credit quality statistics. These percentages represent the performance averages of the 20 largest banks in the United States.  As credit quality has deteriorated industry wide over the last three quarters in particular, Northern Trust's credit quality metrics have continued to perform extremely well, again consistent with our enduring strategies and carefully managed risk appetite.

*     *     *

> *On the credit quality front, our lending business continues to be focused on the needs of their target clients in PFS and in C&IS. As a result, our credit profile continues to stand out as one of the best in the banking industry*.  It would be difficult to find another large bank in the United States or abroad with a $27 million portfolio that has nonperforming assets equal to only 13 basis points of total loans, and that also has those nonperforming assets covered by the loan loss reserve by 4.6 times.

> *This is an area where again, our conservative practices and policies have not wavered, even in the face of industry temptation to move into areas that were alleged to have little or no risk and higher returns*.

*     *     *

> And finally, in our securities lending business, we have reported to you over the course of the last three quarters that our revenues have been hampered by the mark-to-market nature of one fund that represents about 5% of our securities lending collateral.  As I discussed with you in our first-quarter conference call, all of the negative marks in this one fund are unrealized, and we continue to expect that the fund's holdings will mature at par.

> Our securities lending fees on a pro forma basis would have been considerably higher in each of the last three quarters had our clients chosen our more commonly used investment pool instead of the one mark-to-market fund in which they chose to invest.  While we cannot predict to you precisely when these marks will turn positive, I can tell you that the weighted average maturity of this fund equaled 1.6 years as of March 31.

*     *     *

[FRADKIN:] The question relates to the recovery of the marks in securities lending and whether there's a data point externally that one can look at to try and consider what the timing of that will be. And I think, Ken, the answer is, no.

The good news for us is that this is a broad based phenomenon. So the mark to market in this fund is not centered around one security; if that security matures and pays off they're gone. The phenomenon that we're seeing in that fund is very consistent with the phenomenon that you're seeing in other contacts for other companies in relation to the fixed income environment.

Now one of the reasons that you don't see it, at least obviously with some of the other securities lenders is that this does relate very specifically, as we've talked about, to the fact that this is a commingled pool. So put another way, if you had someone who was in the securities lending business with the exact same securities and the exact same amounts but they were handling it in a separate account, the collateral reinvestment in a separate account, they're not marking it to market.

*And so that's why in the last three conference calls we've tried to be careful in pointing out to you that our results are differing from those of others, but it is an accounting – and they're not doing anything wrong I hasten to add, it's just the way the accounting treatment works*. If you're in a pooled fund you do mark it to market; if you're in a separate account you don't. So that's why we've gone out of our way to say this would be the phenomenon in effect if you don't have it in a pooled fund.

*       *       *

[WADDELL:] The question is, the balance sheet looks good; the asset – the loan portfolio looks real good. *Do we see anything in the next couple of quarters that would cause us some level of concern*?

*The answer is no to that. We have, as you know, increased our provision in the first quarter, simply because we are experiencing a lot of loan demand. I mean, our loans are up 24% in the first quarter*. Sherry mentioned a number of the refinancings that we've done for clients who are looking to either get more liquidity or resolve some of these option rate preferred issues.

*Our credit standards on all those loans have not been relaxed. We are sticking to our knitting in terms of collateral values and balance sheets and income statement ratios, and have been able to meet the credit demands of many of our good clients and prospective clients without having to lower our credit standards*.

So, I think the portfolio – we are watching it. We haven't seen any meaningful level of increase in past dues or delinquencies. We did increase the provisions simply because of the growth and it is an uncertain environment. The economy is going to go through some very rough times. And right now, I think we're in good shape, but six months from now, something might pop up that we

- 41 -

would want – we will be glad we have that cushion and that we were able to afford to take it when we did.

84.     On June 17, 2008, Northern Trust attended William Blair & Company's 28th Annual Growth Stock Conference for analysts and media representatives, during which defendant Waddell represented the following:

> Let me talk a little bit about how we have done. ***I think we've handled it pretty well***. As you all know, last year, we posted record results. ***In contrast to many other banks, we had no securities write-downs or unusual charges as a result of the mortgage crisis. In fact, among – against this challenging credit environment, we had – our credit quality actually improve last year***. I will touch upon it. ***It has improved again this year***.

> *               *               *

> ***Finally, we achieved these results while maintaining our rigorous credit management practices. As you can see, our outstanding*** asset ***quality and lack of write-downs in our own securities portfolio where highlights in the quarter.***

> ***It is our differentiated business model within the industry which positions us, I believe, well for the inevitable cycles and the ups and downs of the markets such as we are experiencing now***.

> ***. . . Likewise, our excellent credit quality remains a hallmark at Northern Trust***. Our non-performing assets actually declined last year and again in the first quarter of 2008 when compared with the respective periods a year ago. Our non-performing assets as a percentage of total loans equals an amazing 0.13% of our loans outstanding and that is about 1/10 of the average of the top 20 banks.

85.     On July 16, 2008, Northern Trust issued a press release reporting its second quarter 2008 earnings results. The release reported earnings per share of $0.96, net income of $215.6 million and consolidated revenue of $1.09 billion for the second quarter. The release further reported trust, investment and other servicing fees from the Company's C&IS segment of $409.2 million, which included $149.9 million derived from Northern Trust's securities lending program. In addition, the release reported the Company's reserve for credit losses at June 30, 2008 was $183.1 million, with a provision for credit losses for the second quarter of $10 million. The release further provided in pertinent part:

- 42 -

Frederick H. Waddell, President and Chief Executive Officer, commented, "Northern Trust reported very strong core results in the second quarter – including 24% revenue growth – against the continued backdrop of challenging market conditions. Our revenue growth was driven by trust, investment and other servicing fees; foreign exchange trading income; and net interest income. We achieved strong positive operating leverage in the second quarter with revenue growth of 24% compared to a 16% growth in expenses. Reported results were moderated by non-cash accounting charges associated with the tax treatment of certain lease transactions. Northern Trust's success in this difficult market environment reflects our longstanding client-focused business strategy, position of capital strength, and conservative management philosophy."

86.    After issuing its second quarter 2008 financial results, Northern Trust hosted a conference call for analysts, media representatives and investors on July 16, 2008, during which defendant Fradkin represented the following:

In addition both the year-over-year and sequential quarter comparisons were impacted by positive marks in one mark to market securities lending collateral fund, which benefited our second quarter performance by approximately $25 million. As we have done in the three most recent quarters, let me pause for a moment and provide you with some perspective around our securities lending performance in the current market environment.

First, let me start by reminding you that the unusually high level of credit market dislocation beginning in the summer of 2007, negatively impacted the Securities lending results that we reported to you in the three prior quarters, beginning in the third quarter of 2007. Returns achieved in one mark to market cash collateral investment fund used for securities lending were weak in those prior three quarters, as pricing pressure on fixed income securities persisted, and asset value markdowns flowed directly through to the total return of this fund.

In each of those three prior quarters, we discussed with you our belief that there did not exist any permanent impairment of any holdings, and that all of the asset markdowns recorded in the fund during those prior quarters were unrealized. We said that we expected given what we knew at that time, that all of the funds holdings would mature at par, and that any future positive marks would be reflected in the yield on the fund, and in the result in security lending revenues reported by Northern Trust.

That phenomenon is precisely what happened, and added to our strong performance in the second quarter of 2008. Positive marks recorded in the fund during the second quarter benefited our Securities lending performance in the quarter by approximately $25 million, representing about 14% of the negative impact recorded in the prior three quarters. This $25 million represented approximately $0.07 of benefit to earnings per share in the quarter.

- 43 -

The positive impact of wider spreads and the $25 million mark to market benefit were partially offset by our lower levels of securities lending collateral. Securities lending collateral equaled $238 billion at quarter end down 21%, or $62 billion versus one year ago, and down 11%, or $29 billion compared with March 31.

* * *

During the second quarter, we recorded a loan loss provision of $10 million, compared with the $4 million provision in the second quarter of last year, and a $20 million provision in the first quarter of 2008. The majority of the $10 million provision reflects strong commercial loan growth this quarter. *Credit quality has remained very strong at quarter end*, with non performing assets equal to only $34 million, down $1.3 million, or 4% from the prior quarter. Non performing assets equaled only 12 basis points of total loans at quarter end.

* * *

We also remain focused on the conservative management practices and philosophies that have served us well across many cycles, and over many years. Again, while certainly not immune from the challenging credit cycle that is currently plaguing the lending and securities portfolios of many, we believe that our conservativism has placed us in a far better position than most to manage through the current storm.

* * *

[ANALYST:] I like the streamlined version. So just talk about the sec lending fund for a second. I want to make sure, first on collateral you mentioned that obviously the balances are down 11% sequentially, but just 2% on an average daily balance. I am not asking you to comment necessarily on July, but obviously we should see a little follow-through, plus the typical seasonality on sec lending collateral in the third quarter?

[FRADKIN:] Remember you have to look at that in my view in the context of the market decline, which brings the value down in totality. When you talk about the seasonality, remember that on average over the last five years, our securities lending revenues have declined by 19%. So yes, there is a seasonal effect that will impact fees, but I think in terms of collateral levels, there is a big market value dimension.

* * *

[ANALYST:] Steve, your credit quality has been great. Are there any areas of your loan portfolio that you are concerned about, are monitoring or trying to pare back?

[FRADKIN:] *I think our credit quality has been really outstanding, and we feel good about that*. That said, it is a very difficult environment, and we are not

- 44 -

immune to that environment. I think you have heard some others talk about Florida and Arizona, and we are seeing stress in the real estate markets generally. We are seeing a disproportionate amount of stress in the west coast of Florida, but again, *I want you to keep that in perspective, our asset quality metrics despite that, continue to be far superior overall*.

It is tough out there. But we are still feeling okay, and I guess if I had to pick a place, I would pick the west coast of Florida, as the one we have to keep the closest eye on.

87.     On July 31, 2008, Northern Trust filed a Form 10-Q with the SEC for the second quarter of 2008, which included the same financial results as previously reported in the July 16, 2008 release. The Form 10-Q was accompanied by certifications signed by defendants Waddell and Fradkin, substantially identical to the certification quoted above.

88.     By August 2008, Northern Trust's stock was again trading above $80 per share.

89.     On September 9, 2008, Northern Trust attended Lehman Brothers Global Finance Services Conference with analysts and media representatives, during which defendant Waddell represented the following:

> *One risk we very prudently consistently manage is credit risk. Northern Trust has a long-standing reputation for superior loan quality*. As you can see here, we maintained our high standard of credit quality in stark contrast to peer banks. Our relationship-based conservative lending practices have served us well and are particularly notable in the current environment. Credit at Northern Trust is used as a way to augment a relationship that . . . ultimately we want to be fee-based. On the institutional side of the business over 70% of our credit clients use other fee-based services at Northern.

*     *     *

[WADDELL:] The question – I assume everybody heard that – was about our short-term investment portfolios and the impact in the second quarter and I'm going to take that a little bit – I assume you're talking but our securities lending portfolio and in the second quarter the reversal of some negative marks that we had taken in what we call our short-term extended portfolio, or STEP, over at the previous really year, in the third and fourth quarter of last year and first quarter of this year.

Roughly the numbers are about $175 million of negative marks over the period. About $25 million of that came back in the second quarter. So net net, if you're keeping track that way, about $150 million that is still out there, which we

- 45 -

believe and continue to believe will, as the marks revert back to a market price, will come back.

I can't tell you in the third quarter or project out how they will come back. We still believe that those that the environment will bring those marks back, but when and at what pace we can't say. In terms of our underlying business, our securities lending business continues to grow. We had no major issues in terms of the securities lending operations during the period.

90.     Defendants' statements between October 17, 2007 and September 9, 2008 were false or misleading when made. Defendants knew or recklessly disregarded, but failed to disclose the following:

(a)     As detailed in ¶¶120-156, rather than appropriately accounting for the known and increasing impairments to Northern Trust's home lending and commercial real estate portfolio – and the resulting inflation of the Company's assets – defendants failed to comply with GAAP and appropriately reserve for the Company's loan loss exposure;

(b)     As a result of defendants' GAAP violations, Northern Trust's reported net income and EPS for 3Q 2007 through 2Q 2008 were materially overstated;

(c)     Northern Trust's loan portfolio was not "exceptional" and "extremely clean" nor was its relationship lending strategy "conservative", but rather, its loan quality had been weakened as defendants reduced credit standards to attract and maintain its fee-based client business. As a result, default rates and delinquencies were rising sharply;

(d)     As a result of defendants' weakening of Northern Trust's lending standards, Northern Trust originated inherently risky loans, such as adjustable-rate mortgages, home equity lines of credit and mortgages for vacation homes, particularly in high risk states such as Illinois and Florida;

(e)     Defendants Waddell and Fradkin's certifications included in Northern Trust's FY 2007 Form 10-K and 10-Q reports during this period, stating that the Company's financial results

- 46 -

were reported in accordance with GAAP were, as described below in ¶¶120-156, false or misleading when executed;

(f)     Northern Trust was investing in higher-return securities, which while generating more revenue for Northern Trust, also made the collateral pools' portfolios longer-term, riskier and increasingly illiquid;

(g)     Northern Trust was not disclosing the true risks inhering in its securities lending program and the program's continuing capacity to generate revenue at previous levels. This was so because Northern Trust's Class Period investment strategy exposed participating clients to collateral devaluation and deficiencies, undermining their continued participation in securities lending;

(h)     Northern Trust was effectively ignoring rapidly increasing unrealized losses in the collateral pools, choosing instead to encourage clients to continue their participation through the securities' maturity so that the losses would not have to be immediately realized; and

(i)     Though aware of the increasing risks to the securities lending program – and its clients – Northern Trust did not properly mitigate increasingly significant investment exposures.

## NORTHERN TRUST'S DISCLOSURES REGARDING ITS
## SECURITIES LENDING PROGRAM

91.     On September 17, 2008, Northern Trust issued an SEC Form 8-K report acknowledging impairment from Lehman's September 15, 2008 bankruptcy filing. The report further stated that Lehman had been a borrower of securities under Northern Trust's securities lending program and that the collateral pools held both short- and long-term Lehman fixed income securities. Northern Trust further stated that while its clients had exposure to Lehman securities, the Company did not. Five days later in a follow-on press release, Northern Trust quantified its clients'

Lehman exposure in comingled fixed income funds – including the collateral pools – at $821 million.

92.     On September 29, 2008, Northern Trust issued another press release, which stated:

Northern Trust Corporation today announced three actions to support clients in light of the current turbulent market conditions.

"The hallmark of Northern Trust has always been our financial strength and client focus. With today's actions, we are putting Northern Trust's financial strength to work for our clients during extraordinarily challenging market conditions," said Frederick H. Waddell, President and Chief Executive Officer. "Times of economic stress reinforce the value of the consistent, conservative management practices that have served Northern Trust clients and shareholders well for nearly 120 years."

Northern Trust expects to incur pre-tax charges of approximately $525 million ($328 million after-tax or $1.46 per share) in the third quarter in connection with these three actions.

Northern Trust will increase the support provided for certain cash investment funds previously covered through capital support agreements (as announced February 22, 2008, and amended July 15, 2008) and will add one additional fund to this coverage. The capital support levels provided by Northern Trust will increase in aggregate by $321 million, to a maximum capital contribution of $550 million. These measures will enable the funds to continue to maintain a stable net asset value of $1.00. Northern Trust expects to incur a pre-tax charge of approximately $290 million ($181 million after-tax or $.80 per share) in the third quarter in connection with this action.

*     *     *

Northern Trust also will take certain actions to provide support for securities lending clients whose cash collateral is invested in five constant dollar, commingled investment pools negatively impacted by recent market events. Northern Trust expects to incur a pre-tax charge of approximately $150 million ($94 million after-tax or $.42 per share) in the third quarter in connection with this action.

*     *     *

"We believe these actions reflect both our longstanding and well known commitment to helping our clients, as well as the financial strength of Northern Trust," Waddell said.

The securities lending support was increased to $168 million or $0.47 per share by quarter end.

93.     Following this release, Northern Trust's stock price fell 18.81% to $64.88, a statistically significant change from the previous day. The announced "support" for the securities lending program was necessitated by and a direct cause of the risky, imprudent and illiquid collateral investments Northern Trust effected during the Class Period. Northern Trust's misrepresentations and failure to disclose the on-going and ultimately unavoidable consequences of its securities lending misconduct left investors in Northern Trust's stock unaware of its failed securities lending practices and that the Company's stock price was trading at an artificially inflated level.

## NORTHERN TRUST'S CONTINUING FALSE STATEMENTS REGARDING ITS FINANCIAL ACCOUNTING

94.     On October 22, 2008, Northern Trust issued a press release reporting its third quarter 2008 earnings results. The release reported earnings per share of $0.58, a net income loss of $129.4 million and consolidated revenue of $938.5 million for the third quarter. The release further reported trust, investment and other servicing fees from the Company's C&IS segment of $244.5 million, which included a negative $4.6 million derived from Northern Trust's securities lending program. In addition, the release reported the Company's reserve for credit losses at September 30, 2008 was $207.5 million, with a provision for credit losses for the third quarter of $25 million. The release further provided in pertinent part:

> Frederick H. Waddell, President and Chief Executive Officer, commented, "The third quarter of 2008 represented an extraordinarily challenging period for the financial services industry and world economy. ***The financial strength of Northern Trust, however, continues to be exemplified by our well-capitalized balance sheet ratios, the high quality of our loan and investment portfolios, and our sound credit ratings, hallmarks of Northern Trust which have positioned us well to support our clients in these difficult times***. In support of our clients, we incurred $561.5 million of previously announced charges, which resulted in a net loss of $129 million in the quarter. Northern Trust's position of strength and stability has also fueled growth in our deposit base, which increased over 30% as clients sought a safe haven for their funds. While this quarter's results dampen our very strong performance through the first half of the year, our strategy remains unchanged. We believe our focused business model, conservative financial policies, and commitment to our clients will allow us to manage through this challenging environment."

- 49 -

95.     After issuing its third quarter 2008 financial results, Northern Trust hosted a

conference call for analysts, media representatives and investors on October 22, 2008, during which

defendants represented the following:

> [FRADKIN:] Now let me highlight five items you should consider as you evaluate our performance in the third quarter. . . . we recorded charges totaling $168 million pretax equal to $0.47 per share aftertax in support of securities lending clients that had collateral invested in five constant dollar commingled investment pools.

> *        *        *

> C&IS securities lending fees equaled a negative $4.6 million in the third quarter as compared with $33 million last year and $150 million in the second quarter. Once again, and similar to the results we reported to you in three of the last four quarters, our securities lending fees reflect the ongoing dislocation in the fixed income markets. For us, this again, took the form of negative pricing marks in one mark to market securities lending collateral fund. The impact of the negative marks on our third quarter securities lending fees equaled $96 million, which compares with a negative impact from these marks of $36 million one year ago, and a positive mark impact of $25 million last quarter.

> *        *        *

> Excluding the impact of the mark to market fund, our securities lending fees would have equaled $91 million in the third quarter of 2008, representing an increase of 33% year-over-year and a decrease of 27% compared with the second quarter of 2008. Again, for context recall that the second quarter typically exhibits seasonal strength as a result of the international dividend season which occurs in that quarter.

> *        *        *

> During the third quarter, we recorded a loan loss provision of $25 million, compared with a $6 million provision in the third quarter of last year and a $10 million provision in the second quarter of 2008. The third quarter's loan loss provision reflects broad based loan growth and continued weakness in the overall economy. Loans at quarter end equaled almost $30 billion, an increase of $1.2 billion compared with the prior quarter.

> ***Credit quality remains strong at quarter end, particularly given the challenging economic climate***. Within our loan portfolio, nonperforming assets equaled $61.5 million at September 30th, representing only 21 basis points of total loans at quarter end. Nonperforming assets increased $27 million in the quarter, with the bulk or 95% of the increase being accounted for by only two loans. ***Within our $12 billion available for sale balance sheet investment portfolio, credit risk also continues to be very strong and profiles well when compared with banking industry***

- 50 -

*peers*. Our unrealized losses on available for sale securities equaled only $200 million pretax on September 30th compared with $159 million pretax on June 30th.

\* \* \*

[ANALYST:] Okay. And one last question, you built a reserve this quarter. I am wondering if you can give us an idea of what you feel the appropriate reserve level is, and if you can give us any sense for what your watch list looks like relative to the NPA level at this point?

[FRADKIN:] *Well, I think that the reserve level is what we deem to be appropriate now. We are not building it beyond what we think appropriate*. I would say that our – what we refer to as our 7 and 8 rated loans, which are the loans in our weakest categories, have increased considerably – as you might expect the environment is tough. Our 7 and 8 rated loans at the end of the third quarter equaled $260 million, which was up $138 million from last quarter. So clearly we are seeing some degradation in loan quality. I should add that just for perspective, that in terms of the increase, that really represented order of magnitude a dozen borrowers. So it is not as broad based as the whole portfolio. You have got it focused on a few key places. And I guess to put our 7 and 8 rated loans in context, that $260 million would compare with a recent peak in recent years of about $319 million. *So, we have very, very high loan quality*. And as we have always said, when the environment degrades we will feel some of that. *But our credit metrics remain outstanding, though they're moving up and typically they're triggered by a small number of loans*.

\* \* \*

[ANALYST:] Okay. Secondly, I wondered if you could give us a little bit more color on those two large NPAs you had this quarter – maybe what type of credit they are, what geography or industry they are in?

\* \* \*

[FRADKIN:] *I think Mark, the thing I would remind you and you know well about us is that again the overall portfolio looks to be in very good shape, both in absolute and relative terms, but as will always . . . be the case for us, when you come off very pristine levels of credit quality, anything will show up as a blip. For now, that's what we are experiencing this quarter*.

96. On October 27, 2008, Northern Trust issued a press release entitled "Northern Trust to Participate in US Capital Purchase Program," which stated that The Treasury would invest $1.5 billion in senior preferred stock and related warrants in Northern Trust. The release also quoted Waddell:

- 51 -

"Northern Trust fully supports the U.S. government's efforts to strengthen our nation's financial system . . . "While our capital ratios exceed, by a considerable margin, those needed to earn the designation 'well capitalized,' the program will provide us with additional capital to maximize growth opportunities."

97.     On October 31, 2008, Northern Trust filed a Form 10-Q for the third quarter 2008, which included the same financial results as previously reported in the October 22, 2008 release. The Form 10-Q was accompanied by certifications signed by defendants Waddell and Fradkin, substantially identical to the certification quoted above.

98.     On November 6, 2008, Northern Trust attended the BancAnalysts Association of Boston Conference, during which the following was represented:

[FRADKIN:]  Another dimension of our business model is the consistent strength and stability of our balance sheet. . . .

*        *        *

Similarly, our lending business continues to be focused on the needs of our target clients in CFS and in CNIS. ***Combining this strategic emphasis with our historically conservative underwriting standards, our credit profile continues to stand out as one of the best in the banking industry. It would be difficult to find another large bank in the United States or abroad with a $29 billion loan portfolio that has nonperforming assets equal to only 21 basis points of total loans. This is an area where, again, our conservative practices and policies have not wavered. Even in the face of industry temptation to move into areas that were alleged to have little or no risk and higher returns***.

Our outstanding credit quality is also notably better than peers in a number of key categories. For example, Northern Trust nonperforming assets to loans, loan loss reserves to nonperforming assets, and net charge offs to loans exceed by a significant margin, the average of our peer group of the top 20 banks in the United States.

99.     On November 13, 2008, Northern Trust attended the Merrill Lynch Banking & Financial Services Conference, during which the following was represented:

[FRADKIN:]  ***Our outstanding credit quality is notably better than our peers in a number of key categories.  For example, Northern Trust's nonperforming assets to loans, loan loss reserves to nonperforming assets, and net charge-offs to loans exceed by a significant margin the average of our peer group of the top 20 banks in the United States***.

*        *        *

- 52 -

[UNIDENTIFIED:] I'm sure you get this question a lot. On age of the loan, could you just briefly walk through where you are sort of marking some of this stuff? In terms of your loan portfolio of $29.9 billion, is this basically marked to par? Have you taken additional reserves against it, or how are you thinking about that?

[FRADKIN:] Well, our almost $30 billion loan portfolio is extremely high quality. We have a normal credit process that, each quarter, it goes through. Each of those loans, we rate those loans. We also look at the general economic environment. So we are reserved based on our assessment of individual credits and the macro economic environment. We also, like all of the other major banks, get a chance to, if you will, true-up those loans through the shared national credit process, which means there's a – any loans that we are a participant in, they kind of look across banks to make sure everyone is thinking about them the same way.

*So we believe that we are appropriately reserved for the environment that we've got. Our coverage has gone up as the environment has deteriorated, but certainly, relative to I think any other commercial bank you could find, our loan quality has been extremely high*. Again, it's been extremely high because we are lending to rich people in our personal business. It doesn't mean rich people can't have problems, but relative to lots of other banks, they tend to have fewer problems.

*In our institutional business, we have a very careful credit process, not a credit process that is immune to problems but it's been very careful*. We make use of credit default swaps where we think there are times where we will have a big relationship – asset management, custody and so forth – and a client will want us to provide credit. If we don't want to do that but we think the totality of the relationship justifies it, we will essentially lose money on the loan by providing a loan, taking out a credit default swap to cover our exposure on that loan, and looking at that loan in the totality of total relationship profitability. So we believe that we are appropriately covered for the environment as we see it today.

100. On January 21, 2009, Northern Trust issued a press release reporting its fourth quarter and full year 2008 earnings results. The release reported earnings per share of $1.47, net income of $342.3 million and consolidated revenue of $1.15 billion for the fourth quarter. The release further reported trust, investment and other servicing fees from the Company's C&IS segment of $273.8 million, which included $44.2 million derived from Northern Trust's securities lending program. In addition, the release reported the Company's reserve for credit losses at December 31, 2008 was $251.1 million, with a provision for credit losses for the fourth quarter of $60 million. The release further provided in pertinent part:

- 53 -

Frederick H. Waddell, President and Chief Executive Officer, commented, "Despite the extremely difficult economic conditions, our sound balance sheet and prudent business model enabled us to achieve record fourth quarter performance, and our 2008 full year results were strong in the context of the environment. Our client franchise grew throughout the year and our capital position at year end was solid. We remain focused on exceeding the expectations of our clients.

As we look forward into 2009, we remain confident in our strategic and competitive positioning, notwithstanding a cautious outlook consistent with the very difficult economic conditions."

101.  After issuing its fourth quarter and full year 2008 financial results, Northern Trust

hosted a conference call for analysts, media representatives and investors on January 21, 2009,

during which defendants represented the following:

[FRADKIN:] During the fourth quarter, we recorded a loan loss provision of $60 million compared with an $8 million provision last year and a $25 million provision in the third quarter. The fourth quarter's loan loss provision reflects broad-based loan growth, increased weakness in the overall economy, and a number of specific credits that deteriorated in the fourth quarter. Loans at year end equaled almost $31 billion, an increase of 21% year-over-year and 3% sequentially.

*Credit quality deteriorated during the fourth quarter in light of the challenging economic environment, but continued to remain at levels far stronger than the banking industry at large*. Within our loan portfolio, nonperforming assets equaled $100 million at year end, representing only 33 basis points of total loans. Nonperforming assets increased $39 million in the quarter with about two-thirds of the increase being accounted for by only two loans.

\*       \*       \*

[ANALYST:] Right, right. I'm with you. Then last one. Once again, and I apologize for – I'm keeping in perspective, but NPAs are up a reasonable amount on a percentage basis, so if you look at the trend line that's going up, but at the same time the trend line on the reserve coverage is going down for the last five quarters. It's still 2.4 times, but the two arrows are moving in different directions.

Where, about, is your comfort zone on that coverage, and if NPAs keep rising up, I guess it's natural to assume that the reserve will continue to build?

[FRADKIN:]  I think, our – remember our starting point is always difficult, *our credit quality metrics have been so strong that it's – anything that happens to us is perhaps –*

\*       \*       \*

- 54 -

*Blown up a little bit*. But I think if you think about, we continue to – our loan portfolio continues to grow and grow significantly. Loan growth in the fourth quarter, end of period, was up 21% year-over-year and 3% quarter-over-quarter. *So, we're comfortable with our credit metrics, though clearly, we're concerned about the environment and the headlines that we're seeing. But when we look at our portfolio today we still feel comfortable with where we are*.

*        *        *

[ANALYST:] Hi, Steve. Hi, Bev. I just wanted to circle back on credit quality. If you didn't have the two loans this quarter that migrated to NPA status, would your quarterly provision have been materially lower?

[FRADKIN:] I don't know that I want to comment on that, I just don't have that data in front of me. But I think, Tom, what I would say is as is our normal case, *from our vantage point, the quality of the loan portfolio is high*. It has deteriorated clearly consistent with the environment.

We've seen a significant increase in our 7 and 8 rated loans, so we are not immune, or our clients, I should say, are not immune to the stresses of the environment. So we are seeing that. But again, we start from a very, I think it would be fair to say, pristine base.

102. On January 28, 2009, Northern Trust attended the Citi Financial Services Conference

with analysts and media representatives during which the following was represented:

[WADDELL:] Similarly, our lending business continues to be focused on the needs of our target institutional and personal clients. And our loan portfolio grew over 20% last year. Combining this strategic emphasis with our historically conservative underwriting standards, our credit profile continues to stand out as one of the best in the banking industry.

And when we originate a loan, we put that loan on our balance sheet. These are clients, both on the personal side and on the institutional side, that we know. On the commercial side, our Institutional side, we have other operating business or relationships with about 90% of these borrowers. So we are not just in it for the credit. We are in it for a relationship where we can offer a broad set of typically fee-based capabilities to those clients. And if we don't get that, we typically exit the credit and reduce our exposure.

It would be difficult to find another large bank in the US, or abroad for that matter, with a $31 billion loan portfolio that has nonperforming assets equal to only 33 basis points of total loans. Again, this is an area where we've had a great deal of focus. It is a part of our heritage and our conservative approach to the use of our balance sheet. And that has stood us in good stead in this environment.

*Our outstanding credit quality is noticeably better than our peers' in a number of categories.* For example, our nonperforming assets to loans, as I mentioned, is 33 basis points as of year end. That's materially less than the 187 basis points of the average of the largest banks that were reported in September of last year. And we know what happened in the fourth quarter. We don't have that number yet for the average of our competitors, but you know it's going to go above 187 at year end.

*Our loan loss reserve covers nonperforming assets by 2.3 times, compared with the industry coverage of 1.3. So we believe we have reserve conservatively against future charge-offs.* And our charge-offs to loans in the fourth quarter of only 22 basis points is less than one sixth the industry average.

*So this is meant to give you a sense that in our loan portfolio, while it is stressed, and our charge-offs and our provisions have gone up over the last 12 months, we believe we're in a very good position to handle the economic downturn and the difficulties that our clients are experiencing.*

103.    On February 27, 2009, Northern Trust filed a Form 10-K for the full year and fourth quarter 2008, which included the same financial results as previously reported in the January 21, 2009 release. The Form 10-K was accompanied by certifications signed by defendants Waddell and Fradkin, substantially identical to the certification quoted above.

104.    On April 21, 2009, Northern Trust issued a press release reporting its first quarter 2009 earnings results. The release reported earnings per share of $0.61, net income of $161.8 million and consolidated revenue of $904.2 million for the first quarter. In addition, the release reported the Company's reserve for credit losses at March 31, 2009 of $303.3 million, with a provision for credit losses for the first quarter of $55.0 million. The release further provided in pertinent part:

Frederick H. Waddell, President and Chief Executive Officer, commented, "We continued to see strong growth in our client franchise, notwithstanding the difficult market and credit environment. . . . Our loan portfolio also continued to exhibit strength relative to the environment, even as we continued to increase our reserve for credit losses. As we move into the second quarter, our capital position remains very strong with our tier 1 capital ratio at 13.0% and our tangible common equity ratio at 5.9%. Furthermore, we are continuing our dialogue with the Federal Reserve, in accordance with the prescribed process, to proceed on our objective of

- 56 -

redeeming the U.S. Department of the Treasury's Capital Purchase Program preferred stock as quickly as prudently possible."

105.    After issuing its first quarter 2009 financial results, Northern Trust hosted a conference call with analysts, media representatives and investors on April 21, 2009, during which defendants represented the following:

[FRADKIN:]  During the first quarter we recorded a loan loss provision of $55 million compared with a $20 million provision last year and a $60 million provision in the fourth quarter.  The loan loss provision in the first quarter primarily reflects continued weakness in the overall economy.  Nonperforming assets equaled $172 million at quarter end representing 57 basis points of total loan. Nonperforming assets increased $72 million in the quarter reflecting the addition of ten loans to nonperforming status.  Very importantly, credit quality within our balance sheet investment portfolio also continues to profile very well when compared with the banking industry peers.  Our gross unrealized losses on available for sale securities equaled approximately $324 million pre-tax on March 31, down 10% from $360 million at year end.

*       *       *

[ANALYST:]  Okay.  Thanks.  And then my follow-up on credit quality for a minute, your charge-offs this quarter were really modest but can you give some color on the meaningful uptick and the nonperforming loans this quarter and your outlook for credit quality and provisioning as we pace through '09 and the credit cycle?

[FRADKIN:]  Well, again, let me remind you, we have a $30 billion loan portfolio.  That portfolio is up 14% year-over-year, so we have been growing right through this environment.  We do continue to set aside more reserves which just reflect the impact of the weak economic environment, and I think you can anchor to any metric you want.  It is clearly tougher out there.  ***From our vantage point our credit quality remains very, very strong***.  Nonperforming loans did increase to $168 million, but they represent 55 basis points of total loan, and that's about the industry average at the end of December, and it's gotten worse since then was about 4 times worse than that.  ***So obviously we are not immune to the environment, but I think we feel still very solid about our portfolio***, and if we think about our nonperformers, that was really driven by about 10 loans, so and again, I don't want to imply that there isn't stress across the whole system, ***but the challenge that we always have is that our portfolio historically has been so pristine that when you start comparing it, when you start seeing moves that they really show up in a big way***.

*       *       *

[ANALYST:]  Okay. One last question, credit quality, big portion of your loan portfolio is the residential mortgages. Can you talk a little bit about and give some granularity and color on the Florida real estate related loans, you have some

- 57 -

clients I am sure that have vacation homes and that market has been under a lot of stress, so is there anything you can provide like loan to value and any type of expectations of how these residential loans in Florida might migrate going forward into other risk categories would be really helpful.

*     *     *

[FRADKIN:] ***I guess the other thought we have is we maintain very conservative policies on loan to value***, typically 70% on a first mortgage and 80% on equity credit lines, and we're not underwriting any subprime loans. ***So our portfolio continues to hold up well***. Again, we can't be immune, and if there is a challenge in the broader system, we'll certainly feel some of it, but I would say we are very, very differentiated from the typical bank on this front, Tom.

106.    On this news, Northern Trust's stock dropped $1.98 per share on extremely high volume to close at $56.17 per share on April 21, 2009.

107.    Given defendants' assurances concerning the "pristine" nature of the Company's loan portfolio, and especially defendant Fradkin's comments during the conference call, investors believed the Company's reserves were sufficient given the large provision charge taken in 1Q 2009. Investors further remained unaware of the misrepresentations about the health of the Company's loan portfolio. As a result, Northern Trust's stock continued to trade at artificially inflated levels.

108.    Based upon defendants' reassurances, analysts did not view further loan losses as troubling. For example, the Buckingham Research Group issued a report on April 22, 2009, which stated:

> ***In addition, the loan loss provision was $25m ($0.08 per share) higher than our forecast (for a total of $55m), despite net charge-offs of less than $3m (although NPAs were up from low levels, and a big driver of the reserve build).***

*     *     *

> ***Higher loan loss provisions also drove the operating EPS miss***, with provision expense of $55m nearly triple the $20m of a year ago. In addition, ***nearly all of the provision went into reserves***, given that net charge-offs were less than $3m, or just 0.04% of total loans. ***This resulted in a whopping 21% increase in the loan loss reserve***. That said, it was seemingly warranted given the substantial 70% increase in NPAs off of very low levels ($170m up from $100m). ***Reserve coverage seems relatively strong***, with reserves now 1% of total loans (vs. a 0.04% net charge-off ratio) and 180% of NPLs. Looking forward, we expect NPAs to continue to move

- 58 -

higher considering the economic environment – and hence reserve building should continue. That said, ***we don't expect the rate of increase in NPAs to be as material, and thus we do expect reserve building to decline as well. As a result, we are forecasting that provision expense falls to $40-$45m over the next two quarters***.

109.     Defendants' statements between October 22, 2008 and April 21, 2009 were false or misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose the following:

(a)     As detailed in ¶¶120-156, rather than appropriately accounting for the known and increasing impairments to Northern Trust's home lending and commercial real estate portfolio – and the resulting inflation of the Company's assets – defendants failed to comply with GAAP and appropriately reserve for the Company's loan loss exposure;

(b)     As a result of defendants' GAAP violations, Northern Trust's reported net income and EPS for 3Q 2007 through 2Q 2009 were materially overstated;

(c)     Northern Trust's loan portfolio was not "exceptional" and "extremely clean" nor was its relationship lending strategy "conservative", but rather, its loan quality had been weakened as defendants reduced credit standards to attract and maintain its fee-based client business. As a result, default rates and delinquencies were rising sharply;

(d)     As a result of defendants' weakening of Northern Trust's lending standards, Northern Trust originated inherently risky loans, such as adjustable-rate mortgages, home equity lines of credit and mortgages for vacation homes, particularly in high risk states such as Illinois and Florida; and

110.     Defendants Waddell and Fradkin's certifications included in Northern Trust's Form 10-K and 10-Q reports during this period, stating that the Company's financial results were reported in accordance with GAAP were, as described below in ¶¶120-156, false or misleading when executed.

- 59 -

111.    On April 24, 2009, Northern Trust filed a Form 10-Q for the first quarter of 2009, which included the same financial results as previously reported in the April 21, 2009 release. The Form 10-Q was accompanied by certifications signed by defendants Waddell and Fradkin, substantially identical to the certification quoted above.

112.    On May 12, 2009, Northern Trust attended the UBS Global Financial Services Conference with analysts and media representatives, during which the following was represented:

> [WADDELL:] Likewise, and in sharp contrast to many of our brethren in the industry, the quality of Northern Trust's loan portfolio continues to exhibit strength, particularly when considered against the backdrop of the current weak state of the economy.
>
> While we are not immune from general economic conditions, Northern Trust continues to outperform the industry in each of the three noted loan quality metrics shown on this slide, and I would note, by a large margin. We are a very conservative lender. This long-standing, relationship-based lending philosophy that we have has continued to serve our clients and our shareholders very well during this economic downturn.

113.    On June 9, 2009, Northern Trust issued a press release announcing it had received authority from the federal government to redeem $1.576 billion in preferred shares issued to the U.S. Department of Treasury pursuant to the TARP Capital Purchase Program. The release further stated:

> "Northern Trust is one of the best capitalized major banks in the industry and will remain so following our exit from the TARP Capital Purchase Program," Northern Trust President and Chief Executive Officer Frederick H. Waddell said. "We supported the Capital Purchase Program as an important element in restoring stability to the U.S. financial system and acknowledge the taxpayers' support of the financial system during these difficult times. Now we are pleased to return this capital in the best interests of our shareholders, clients, employees and taxpayers."

114.    On July 22, 2009, Northern Trust issued a press release reporting its second quarter 2009 earnings results. The release reported earnings per share of $0.95, net income of $314.2 million and consolidated revenue of $1.05 billion for the second quarter. In addition, the release reported the Company's reserve for credit losses at June 30, 2009 was $319.1 million, with a

provision for credit losses for the second quarter of $60 million. The release further provided in part:

> Frederick H. Waddell, President and Chief Executive Officer, commented, "We are pleased with our performance in the quarter. Client assets under custody and management, which represent an important component of our business, increased 13% and 7%, respectively, during the quarter. Improved market conditions favorably impacted securities lending revenues and reduced our obligations under capital support agreements with certain Northern Trust investment vehicles. While encouraged by our results, economic conditions remain difficult. In this challenging environment, we continue to maintain a heightened focus on serving the needs of our clients.

> In the second quarter, we successfully completed a public offering of common stock, raising $834.5 million, and issued $500 million of senior notes. We were also pleased to complete the redemption of the $1.576 billion in preferred shares while maintaining *an exceptionally strong capital position*, including a tier 1 capital ratio of 12.6% and a tier 1 common equity ratio of 12.1%, as of June 30, 2009."

115. After releasing its second quarter 2009 financial results, Northern Trust hosted a conference call for analysts, media representatives and investors on July 22, 2009, during which the following was represented:

> [FRADKIN:] During the second quarter we recorded a loan loss provision of $60 million, compared with a $10 million provision last year, and a $55 million provision in the first quarter. Our reserve for credit losses equaled $319 million at June 30, up 74%, or $136 million from June 30 last year, reflecting the weak economic climate.

> Nonperforming assets equaled $234 million at quarter end, an increase of $62 million in the quarter, and represented 81 basis points of total loans at quarter end. Net charge-offs equaled $44 million. Despite elevated levels of nonperforming assets and charge-offs off a very low historic base, Northern Trust's conservative and focused lending practices, have allowed us to weather this credit cycle better than many industry peers.

> *          *          *

> [ANALYST:] That makes sense. I guess one of the potholes I have seen on the road ahead is related to the credit side, and I was wondering if you can potentially talk to kind of reserve levels, and what do you think is a reasonable level? You ended the quarter at about 1% of reserves to loans, and if you look back in history for you guys, I mean there has been plenty of years where you have had reserves well above 2%. So what has changed in your opinion, if anything, that would preclude reserves to loans, not going up to 2% of loans over the next year or so?

[FRADKIN:] You build reserves and then as things get bad, some of those reserves come down in the form of nonperformers. ***We feel very comfortable with the loan portfolio. Again, when you think about our portfolio it is quite different from many other banks***. We are about 37% residential real estate, and that is our high net worth client base, 25% commercial, 11% commercial real estate, 17% personal loans, and then 10% other. ***The quality of the portfolio continues to be very sound, but relative to year ago levels, and two years ago it is clearly a 'worse as would you expect' in this environment. But I think in the context of our total $29 billion portfolio, we still feel good***.

116.    On July 29, 2009, Northern Trust filed a Form 10-Q for the second quarter of 2009, which included the same financial results as previously reported in the July 22, 2009 release. The Form 10-Q was accompanied by certifications signed by defendants Waddell and Fradkin, substantially identical to the certification quoted above.

117.    Defendants' statements between April 24, 2009 and July 29, 2009 were false or misleading when made. Defendants knew or recklessly disregarded, but failed to disclose the following:

(a)    As detailed in ¶¶120-156, rather than appropriately accounting for the known and increasing impairments to Northern Trust's home lending and commercial real estate portfolio – and the resulting inflation of the Company's assets – defendants failed to comply with GAAP and appropriately reserve for the Company's loan loss exposure;

(b)    As a result of defendants' GAAP violations, Northern Trust's reported net income and EPS for 3Q 2007 through 2Q 2008 were materially overstated;

(c)    Northern Trust's loan portfolio was not "exceptional" and "extremely clean" nor was its relationship lending strategy "conservative", but rather, its loan quality had been weakened as defendants reduced credit standards to attract and maintain its fee-based client business. As a result, default rates and delinquencies were rising sharply;

(d)    As a result of defendants' weakening of Northern Trust's lending standards, Northern Trust originated inherently risky loans, such as adjustable-rate mortgages, home equity

- 62 -

lines of credit and mortgages for vacation homes, particularly in high risk states such as Illinois and Florida; and

(e)    Defendants Waddell and Fradkin's certifications included in Northern Trust's Form 10-Q reports during this period, stating that the Company's financial results were reported in accordance with GAAP were, as described below in ¶¶120-156, false or misleading when executed.

## THE FINAL REVELATION OF NORTHERN TRUST'S DECEPTION CONCERNING ITS FALSE FINANCIAL ACCOUNTING

118.    On October 21, 2009, before the market opened, Northern Trust issued a press release reporting its third quarter 2009 earnings results.  The release reported earnings per share of $0.77, net income of $187.9 million and consolidated revenue of $927.6 million for the third quarter.  In addition, the release reported that the Company's reserve for credit losses at September 30, 2009 was $333.0 million with a provision for credit losses for the third quarter of $60 million.  The release further provided in pertinent part:

Frederick H. Waddell, President and Chief Executive Officer, commented, "The financial markets continue to send mixed signals.  Although equity markets improved compared with the second quarter, they remain well below year-ago levels and interest rates have fallen dramatically year-over-year.  Amidst these crosscurrents, we experienced strong growth in client assets, with assets under custody increasing 11% and assets under management increasing 9% in the quarter. Our focused business model, strong balance sheet, and conservative financial management continue to position us well to serve the evolving needs of our personal and institutional clients.

In the third quarter, we repurchased the warrant that was issued to the U.S. Department of the Treasury under its Capital Purchase Program at a cost of $87 million.  This completed Northern Trust's participation in the Capital Purchase Program.  Our capital position continues to be very strong, as evidenced by a tier 1 capital ratio of 13.2% and a tier 1 common equity ratio of 12.7%, as of September 30, 2009."

119.    On this news, Northern Trust's stock collapsed $3.29 per share to close at $54.16 per share on October 21, 2009, a one-day decline of nearly 6% on volume of over 8.55 million shares.

### NORTHERN TRUST'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP

**Background**

120.    As detailed herein, Northern Trust's publicly issued financial statements[2] and related earnings releases during the Class Period were materially misstated in violation of GAAP[3] because defendants failed to record adequate and timely loan loss reserves and misled investors as to the significant loss exposure Northern Trust faced related to the Company's portfolio of loans.

121.    The two central accounting items related to defendants' fraudulent manipulation of Northern Trust's loan loss reserves during the Class Period were the reserve or Allowance for Loan and Lease Losses ("ALLL") on the balance sheet (which reduces assets), and the corresponding Provision for Credit Losses, which is a direct reduction of pre-tax earnings on Northern Trust's income statement. The accounting for these items is governed by specific GAAP provisions and SEC rules. Because there is a plethora of guidance on the subject, defendants were well informed of how to account for the ALLL and provision for credit losses during the Class Period. Given

---

[2]    Northern Trust's Class Period Financial Statements referred to herein, include:

| Filing | Fiscal Period | End of Fiscal Period | Filed with SEC |
|--------|---------------|----------------------|----------------|
| 10-Q | 3Q2007 | September 30, 2007 | October 30, 2007 |
| 10-K | FY2007 | December 31, 2007 | February 28, 2008 |
| 10-Q | 1Q2008 | March 31, 2008 | May 5, 2008 |
| 10-Q | 2Q2008 | June 30, 2008 | July 31, 2008 |
| 10-Q | 3Q2008 | September 30, 2008 | October 31, 2008 |
| 10-K | FY2008 | December 31, 2008 | February 27, 2009 |
| 10-Q | 1Q2009 | March 31, 2009 | April 24, 2009 |
| 10-Q | 2Q2009 | June 30, 2009 | July 29, 2009 |

[3]    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

- 64 -

Northern Trust's loan portfolio comprised nearly 40% of the Company's total assets, these accounting items were the most important estimates Northern Trust made in its financial statements. The rules that defendants violated are set forth below.

122. SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102") states, "For many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements." Northern Trust was no exception, and as a result of its failure to record adequate and timely loan loss reserves, Northern Trust's financial statements during the Class Period were in violation of GAAP. Northern Trust's reported net loans, pre-tax income and EPS were materially overstated and its provision for credit losses was understated for each quarter during the Class Period as shown in the chart below:

| ($ in millions – except per share data) | 3Q 2007 | 4Q 2007 | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | 1Q 2009 | 2Q 2009 |
|---|---|---|---|---|---|---|---|---|
| Loans and Leases, net | 24,908.1 | 25,340.1 | 26,760.5 | 28,677.9 | 29,870.2 | 30,755.4 | 30,410.9 | 29,027.1 |
| Reserve for Credit Losses | (143.2) | (148.1) | (165.4) | (172.5) | (194.7) | (229.1) | (286.2) | (297.3) |
| Provision for Credit Losses | 6.0 | 8.0 | 20.0 | 10.0 | 25.0 | 60.0 | 55.0 | 60.0 |
| Net Income (Loss) | 208.3 | 125.0 | 385.2 | 215.6 | (148.3) | 342.3 | 138.8 | $314.2 |
| EPS - Diluted | $0.93 | $0.55 | $1.71 | $0.96 | ($0.67) | $1.47 | $0.61 | $0.95 |

- 65 -

**Applicable Accounting Rules**

123.    Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5") [4], SAB 102, Statement of Financial Accounting Standards No. 114, *Accounting by Creditors for Impairment of a Loan* ("SFAS 114"), EITF Topic No. D-80, *Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio* ("EITF Topic D-80"), FASB Interpretation No. 14 *Reasonable Estimation of the Amount of a Loss* ("FIN 14"), SEC Financial Reporting Release No. 28 ("FRR 28"), and Statement of Financial Accounting Standards No. 65, *Accounting for Certain Mortgage Banking Activities* ("FAS 65") set forth the standards of financial accounting and reporting for loan loss reserves.

124.    Additionally, the AICPA issues industry-specific Audit & Accounting Guides to provide guidance in preparing financial statements in accordance with GAAP. The Audit and Accounting Guide for Depository and Lending Institutions ("AICPA Audit and Accounting Guide") was applicable to Northern Trust. The AICPA also issues Audit Risk Alerts particularized by industry, which address areas of concern and identify the significant business risks that may result in the material misstatement of the financial statements.

### DEFENDANTS CONCEALED IMPAIRMENTS AND LOSSES IN NORTHERN TRUST'S LOAN PORTFOLIO IN VIOLATION OF GAAP

**Summary**

125.    Unlike many lending institutions, all of Northern Trust's credit decisions are made by one single group, the Credit Policy business unit. Credit Policy manages the Company's credit-

---

[4]    On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued SFAS No. 168, *The FASB Accounting Standards Codification™ and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162*. FASB *Accounting Standards Codification™* ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC. These allegations use the historical references to U.S. GAAP; as such references existed during the Class Period.

related activities, including establishing and monitoring all credit-related polices and practices throughout the entire Company. An integral part of the Credit Policy's function is to review all past due and potential loans to determine whether loans should be placed on non-accrual status or charged off.[5] The Credit Policy business unit reports directly to Northern Trust's Head of Corporate Risk Management.[6] The Head of Corporate Risk Management, in turn, reports directly to Northern Trust's CEO. These practices required a heightened level of loss reserves to account for the increased risk associated with Northern Trust's loan portfolio.

126.    Northern Trust's residential and commercial loans were rapidly deteriorating throughout the Class Period, yet defendants failed to recognize the losses in accordance with GAAP. Additionally, as alleged in greater detail herein, defendants caused Northern Trust to engage in the origination of inherently risky, low-quality loans in order to support or attract fee-based clients. Such lending was a key to Northern Trust's overall growth in 2008 (*i.e.*, its total loans and lease balance grew from $25.3 billion at year end 2007 to $30.8 billion at year end 2008).

127.    While the general risks of the loans associated with the deteriorating real estate market were recognized by investors, defendants assured investors that Northern Trust's loan portfolio was "exceptional" and "extremely clean" and how the Company's "excellent loan quality" was "a hallmark of Northern Trust's relationship lending strategy". Both prior to and during the

---

[5]    A non-accrual loan is a nonperforming loan that is not generating or accruing the stated interest rate of the loan due to nonpayment by the borrower. Banking regulators require that nonperforming loans be classified as non-accrual if principal and interest has not been paid for at least 90 days unless the lender has sufficient collateral to cover the loan.

In the context of a loan, a charge-off occurs when the lender determines that it is not likely that it will be paid by the borrower and thus the lender will write-off the problematic loan against the lender's current earnings. Typically, loans will be written-off after six months of non-payment.

[6]    Joyce St. Clair, an Executive Vice President of Northern Trust, has served in the role of Head of Corporate Risk Management since April 2007.

- 67 -

Class Period, however, defendants sacrificed quality by originating riskier loans in order to maintain its all important fee-based clients.  Moreover, throughout the Class Period, default rates began to sharply rise at Northern Trust.  Its charge-offs, net of recoveries, jumped from $2 million for 3Q 2007 to $46.1 million for 3Q 2009 – an increase of *over twenty-three* times.  *See* the attached chart:



128.    Defendants, nevertheless, repeatedly continued to praise Northern Trust's strong financial statements and its conservative management practices and polices, while failing to record adequate and timely loan loss reserves on Northern Trust's portfolio of loans.  Instead, defendants hid the mounting losses and risks associated with Northern Trust's lending business from investors. As the market worsened, defendants were forced to disclose that those assets had been overvalued and under-reserved.

- 68 -

129. Ultimately, at the end of the Class Period, Northern Trust had to greatly increase the ALLL, from 0.57% of loans as of October 31, 2007 to 1.09% as of October 31, 2009. The provision for credit losses increased to $215 million in 2009, *a nearly twelve-fold increase* since 2007. Northern Trust's ALLL and provision for credit losses remained elevated throughout the end of 2009 and throughout 2010 as the Company continued to experience losses from the risky loans it entered into both prior to and during the Class Period. *See* the chart below:



130. In accordance with GAAP and reflecting the already known risks and impairments to the loan portfolio, a substantial portion of these losses, however, should have been taken in the form of loan loss reserves beginning in 2007. Had defendants complied with GAAP and properly accounted for the true value of the loan portfolio, the reported losses would have substantially

- 69 -

decreased Northern Trust's earnings and given investors a true picture of the Company's financial health.

**Northern Trust's High Risk Loan Portfolio Was Susceptible to Losses and Defendants Ignored Red Flags**

131.    Defendants were required, under GAAP, to take into account various portfolio attributes in evaluating the possible impairment of Northern Trust's loan portfolio and in the calculation of appropriate loan loss reserves at the end of each quarter. Defendants were also required to, under GAAP – and explicitly stated in their SEC filings that they did – assess various economic and industry trends when calculating the ALLL. Defendants in this case, ignored these trends or red flags. The red flags include, but are not limited to, the red flags indentified in ¶31, in addition to the following, all of which should have strongly indicated to defendants that the visibility and value of Northern Trust's portfolio was impaired:

- From October 2007 to October 2008 to October 2009, nonperforming assets[7] associated with Northern Trust's portfolio increased dramatically from $29.3 million to $61.5 million to $301.5 million, respectively.

- Northern Trust's net charge-offs for fiscal year 2009 were $125.8 million compared to charge-offs of $8.8 million for 2007, an increase of over 1400%. Likewise Northern Trust's provision increased from $18 million in 2007 to $215 million in 2009.

- During the Class Period, the largest geographic concentrations in Northern Trust's residential real estate lending portfolio were Illinois (Greater Chicago area), Florida and Arizona – states that had seen increases in housing prices and historically had had high risks for defaults and foreclosures. At December 31, 2008, $7.7 billion or 74% of its entire home lending mortgage portfolio were associated with these three states. Northern Trust's commercial real estate lending portfolio was also primarily located in the Illinois and Florida markets.

---

[7]     Northern Trust's nonperforming assets consist of nonaccrual loans and Other Real Estate Owned ("OREO"). OREO is comprised of commercial and residential property acquired in partial or total satisfaction of problems loans.

- The value of the collateral on the loans was decreasing as the housing and commercial real estate market was swiftly deteriorating, thus increasing the risk of credit loss for Northern Trust.

- As part of its credit process, Northern Trust utilizes an internal risk ranking system. Ratings for borrowers range from "1" for the strongest credit to "7" for the weakest. Ratings of "8" or "9" are used for defaulted borrowers. By 2Q 2009, $699.9 million of Northern Trust's loans were rated either or "7" or "8", with only $219.8 million of it being classified as impaired.

- Many of Northern Trust's residential real estate loans involved adjustable rate mortgages, which carry a higher risk over fixed-rate mortgages. As of December 31, 2008, over 77% of the residential home loans in Northern Trust's troubled Miami subsidiary's portfolio were comprised of adjustable rate mortgages.

- Northern Trust also engaged in other types of riskier lending such as providing its customers with home equity lines of credit and consumer type loans. As of December 31, 2008, over 22% of Northern Trust's troubled Miami subsidiary's total loan portfolio were comprised of lines of credit and consumer loans.

- Given Northern Trust's loans were to wealthier individuals, the residential real estate loans were for much larger amounts than average home loans and hence when one of Northern Trust's loans became impaired it had a greater impact on the Company's financial results than would a typical home loan portfolio.

- Given the size of each loan and the Company's personalized customer service approach, Northern Trust employees were keenly aware of the circumstances surrounding the Company's troubled loans.

- Many of Northern Trust's high-net worth clients owned second homes in coastal communities such as Florida for which Northern Trust had provided the mortgage. Mortgages for second homes are inherently riskier than mortgages for primary residences as there is more temptation and ease for a person to walk away from a property if it is not their primary residence.

**Northern Trust Violated GAAP**

**GAAP Provisions Violated by Defendants in Accounting for Loan Loss Reserves**

132. The AICPA Audit and Accounting Guide for Finance Companies states:

*Finance receivables normally are the most significant portion of a finance company's total assets*. . . . A finance company should maintain a reasonable *allowance for credit losses . . . . The allowance for loan losses reduces the carrying amount of loans receivable to the amount that is estimated to be collectible*.

- 71 -

133.    During a November 2000 speech to the AICPA National Conference on Banks and

Savings Institutions, the Deputy Chief Accountant of the SEC stated the following:

> In plain English, the allowance for loan losses must reflect, on a timely basis, the
> changes in the credit quality of an institution's loan portfolio. *As credit quality
> deteriorates, the allowance should be adjusted upward in a timely fashion to reflect
> the additional losses that have been incurred*.

134.    During the Class Period, Northern Trust's ALLL failed to cover the likely and

estimable losses associated with the Company's $30+ billion portfolio of risky loans.

135.    Section 9.19 of the AICPA Audit and Accounting Guide for provides that financial

institutions are responsible for "*[m]aintain[ing] adequate controls to ensure the ALLL is

consistently determined in accordance with GAAP, stated policies and procedures, and relevant

supervisory guidance*."

136.    Section 9.04 of the same Accounting Guide for Depository and Lending Institutions

also provides: "*Management is responsible* for estimating credit losses. . . . and involves

management making careful judgments about collectibility and estimates of losses. *Management's

judgments often depend on micro- and macro-economic factors; past, current, and anticipated

events based on facts in evidence at the balance-sheet date*; and realistic courses of action it expects

to take."

137.    Under GAAP, a loss contingency is an existing condition, situation, or set of

circumstances involving uncertainty as to possible loss. *See* SFAS 5, ¶1. The collectibility of loans

is an example of a loss contingency. GAAP requires that an estimated loss from a loss contingency

be accrued by a charge to income if both of the following conditions are met: (a) information

available prior to issuance of the financial statements indicates that it is probable that an asset had

been impaired or a liability had been incurred at the date of the financial statements; and (b) the

amount of loss can be reasonably estimated. *See* SFAS 5, ¶8.

138.    Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS 5 are not met, or if an exposure to loss exists in excess of the amount accrued, defendants were still required to disclose the contingency when there is at least a "***reasonable possibility***" that a loss or an additional loss may have been incurred.[8]  SFAS 5, ¶10.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.  *See* SFAS 5, ¶10.

139.    In assessing the collectibility of a loan, a company will either evaluate the loan on a separate basis under SFAS 114, Accounting by Creditors for Impairment of a Loan, or will group the loan together into a risk pool with other loans having similar characteristics under SFAS 5.  While SFAS 5 provides the basic guidance for recognition of impairment losses for all contingencies, SFAS 114 provides guidance on measurement and disclosure for loans that are individually identified for evaluation and deemed to be impaired.  A company will establish a Specific Valuation Allowance ("SVA") for impairments losses related to specific loans in accordance with SFAS 114 and will establish a General Valuation Allowance ("GVA") for losses related to a pool of loans in accordance with SFAS 5.

140.    According to the Company's SEC filings, Northern Trust's ALLL is based on two components: (1) the specific reserve – for impairments to specific loans calculated on a loan-by-loan basis and (2) the inherent reserve – for impairments to its loan portfolios due to the inherent risk involved in the lending practice calculated on a credit portfolio basis.

---

[8]    GAAP defines "[r]easonably possible" as "[t]he chance of the future event or events occurring is ***more than remote but less than likely***."  SFAS 5, ¶3.

**Defendants Ignored Internal and External Risk Factors**

141.    In calculating all of the above components of its required loan loss reserves for 3Q 2007 through 2Q 2009, defendants were required, under GAAP and Northern Trust's stated reserve policy, to consider the various portfolio attributes and red flags described above, as well as the inherent risks associated with residential and commercial lending.  SAB 102 states that:

A registrant's loan loss allowance methodology generally should:

* * *

Consider *all known relevant internal and external factors* that may affect loan collectability;

*Consider the particular risks inherent in different kinds of lending* . . . .

The SEC further stated in SAB 102 that:

In developing loss measurements, *registrants should consider the impact of current environmental factors* and then document which factors were used in the analysis and how those factors affected the loss measurements. Factors that should be considered in developing loss measurements include the following:

*Levels of and trends in delinquencies* and impaired loans;

*Levels of and trends in charge-offs* and recoveries;

Trends in volume and *terms of loans*;

*Effects of any changes in risk selection and underwriting standards*, and other changes in lending policies, procedures, and practices;

Experience, ability, and depth of lending management and other relevant staff;

*National and local economic trends and conditions*;

*Industry conditions*; and

Effects of changes in *credit concentrations*.

142.    Similarly, the AICPA Audit and Accounting Guide for Finance Companies states:

. . . *present conditions* such as the amount of *delinquent receivables* and the number of days they are past due; *local, national, and international economic trends; credit policies and procedures*; and the mix of receivables should be taken into account in evaluating the adequacy of the allowance.

- 74 -

143.    While defendants acknowledged at the beginning of the Class Period that the real estate market was deteriorating and was expected to worsen throughout 2008 and 2009, defendants continued to claim that the Company's residential and commercial real estate lending portfolio's valuation and reserves reflected that trend and projected risks.  In fact, defendants had barely altered Northern Trust's loan loss reserves, which were just $143.1 million as of October 31, 2007 or 0.6% of total gross loans and leases.  Defendants continued to maintain the Company's ALLL in the same range until year end 2008 when it began to slowly increase reserves to a sufficient level.  At a minimum if defendants had simply raised the reserve to 1.1%,[9] setting aside the downward trend in the loan portfolio credit metrics, the significant level of high risk loans, defendants' lax lending standards and readily apparent economic environment risks and red flags, Northern Trust's reserve should have been increased by, at a minimum, $128.3 million for 3Q 2007 and $128.1 million for 4Q 2007.

**Defendants Failed to Reserve for Northern Trust's Impaired Loans**

144.    FAS 114 and Emerging Issues Task Force ("EITF") Topic D-80 clearly describe that an evaluation of loan impairment must be made in context of current information and events, stating in part:

> A loan is *impaired* when, *based on current information and events*, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. All amounts due according to the contractual terms means that both the contractual interest payments and contractual principal payments will be collected as scheduled in the loan agreement. *Existing "environmental" factors (for example, existing industry, geographical, economic, and political factors) should be considered as part of current information and events when assessing a loan* that has been identified for evaluation under Statement 114.

---

[9]    Defendants have maintained Northern Trust's reserves at 1.1% of total gross loans and leases or more since 3Q 2009.

145.     In a hypothetical example included in EITF Topic D-80, the EITF described how current environmental factors, such as the "red flags" described herein, impact the evaluation of loan impairment in light of historical loss statistics. EITF Topic D-80 states in part:

> The bank would consider the effect of the current economic downturn to assess whether a loss has been incurred in that group of loans at the balance sheet date and to estimate the amount of loss. In doing so, the bank would consider its historical loss experience in collecting loans in similar situations, such as the typical recovery rate, including amount and timing. ***However, the use of historical statistics alone would be inappropriate if the nature of the loans or current environmental conditions differ from those on which the statistics were based***.

146.     Defendants' failure to increase or adequately reserve for the real estate loans, ignored substantial changes in the macroeconomic conditions impacting Northern Trust's loans as well as Northern Trust's lax lending strategy. These internally known factors included rising delinquency rates, high rates of adjustable rate mortgages, and heavy loan concentrations in Illinois, Florida and Arizona, including significant exposure to the struggling second home Florida market.

**Northern Trust Failed to Reserve for Groups of Loans with Characteristics that Indicated Probable Losses**

147.     SAB 102 states:

A registrant's loan loss allowance methodology generally should:

\*          \*          \*

***Consider the particular risks inherent in different kinds of lending*** . . . .

148.     Even where loans were not delinquent and impaired under GAAP, defendants were required to set reserves to reflect the risks associated with loans with similar characteristics to those that were impaired. EITF Topic D-80 states:

> ***Simply because a portion of the allowance is designated as "unallocated," it is not thereby inconsistent with GAAP***. The important consideration is whether the allowance reflects an estimate of probable losses, determined in accordance with GAAP, and is appropriately supported.

\*          \*          \*

- 76 -

[S]ome loans that are specifically identified for evaluation may be individually impaired, while other loans, that are not impaired individually pursuant to FAS 114, may have ***specific characteristics that indicate that there would be probable loss in a group of loans with those characteristics***. Loans in the first category must be accounted for under FAS 114 and ***loans in the second category should be accounted for under FAS 5***. Under FAS 5, ***a loss is accrued if characteristics of a loan indicate that it is probable that a group of similar loans includes some losses even though the loss could not be identified with a specific loan***. [fn] Moreover, current GAAP . . . emphasize that ***the loss does not have to be virtually certain in order to be recognized***.

149.     Similarly, FAS 5 states:

[A]ccrual shall be made even though the particular receivables that are uncollectible may not be identifiable.

150.     In violation of GAAP described above, defendants failed to group its loans into categories based upon shared characteristics in determining the appropriate level of reserve for the inherent component of its ALLL.  In its 2008 Form 10-K report filed in February 2009, Northern Trust disclosed that it had changed the methodology used in calculating the inherent portion of its reserve by first aggregating loans into different categories based upon shared levels of risk and then setting the appropriate reserve level based upon the different risk categories.  Previously, the Company had calculated a portion of its inherent reserve on an unallocated basis and simply calculated this portion of the reserve based upon the credit portfolio as a whole.

**Defendants Failed to Account for Declining Collateral Values**

151.     In calculating Northern Trust's loan loss reserves, defendants were also required to consider the declining value of the collateral backing its home and commercial real estate loans.  In assessing loans for impairment, a company's management first identifies loans in which it is probable that the company will be unable to collect all amounts due according to the contractual terms of the loan agreements.  Thereafter, management must then evaluate the fair value of the underlying collateral to arrive at estimated impairment losses.  As domestic property values

- 77 -

collapsed, delinquencies and subsequent foreclosures in Northern Trust's home lending portfolio were more likely to, and did, result in significant losses. SAB 102 states:

A registrant's loan loss allowance methodology generally should:

*       *       *

Consider current collateral values (less costs to sell) . . . .

EITF Topic D-80 states:

In assessing whether loans are fully collateralized and thus whether there is a need for an allowance on those loans, institutions should consider the reliability and timing of appraisals or other valuations to ensure that the values used for any allowance calculations are realistically and reliably measured. An institution should *ensure that an appraisal of collateral reflects a realistic estimate of fair value*, which takes into consideration the time it will take the institution to realize the value of the collateral and *current market conditions for selling the collateral*.

152.    Given the value of the underlying assets of Northern Trust's residential and commercial real estate loans were dropping rapidly, market conditions required that defendants adjust Northern Trust's loan loss allowance to reflect the default risks. Defendants, however, failed to timely adjust Northern Trust's allowance or reassess the value of the Company's collateral assets.

**Northern Trust's Financial Statements Were Materially Misstated**

153.    As a result of defendants' violations of GAAP and failure to record adequate and timely loan loss reserves, Northern Trust's financial statements were materially misstated. If Northern Trust had increased its ALLL for 3Q and 4Q 2007, fiscal year 2008 and the first two quarters of 2009, it would have dramatically decreased the Company's reported net income and diluted EPS as follows:

| (in millions of $ Except Diluted EPS) | 3Q 2007 | 4Q 2007 | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | 1Q 2009 | 2Q 2009 |
|---|---|---|---|---|---|---|---|---|
| **_As Reported_** | | | | | | | | |
| Net Income | 208.3 | 125.0 | 385.2 | 215.6 | (148.3) | 342.3 | 161.8 | 314.2 |
| Diluted EPS | $0.93 | $0.55 | $1.71 | $0.96 | ($0.67) | $1.47 | $0.61 | $0.95 |
| **_Adjustment_** | | | | | | | | |
| Understatement in ALLL | (128.3) | (128.1) | (126.3) | (140.1) | (130.9) | (106.1) | (45.3) | (19.1) |
| Overstatement in Net Income[10] | 88.8 | 95.5 | 84.1 | 70.6 | 76.8 | 69.6 | 29.9 | 12.7 |
| Overstatement in Diluted EPS | $0.40 | $0.42 | $0.37 | $0.31 | $0.35 | $0.31 | $0.13 | $0.05 |
| **_As Revised_** | | | | | | | | |
| Net Income | 119.5 | 29.5 | 301.1 | 145.0 | (225.1) | 272.7 | 131.9 | 301.5 |
| Diluted EPS | $0.53 | $0.13 | $1.34 | $0.64 | ($1.01) | $1.16 | $0.49 | $0.90 |

154.     These amounts reflect an extremely conservative additional reserve amount based on the assumption that Northern Trust's ALLL had been increased to a rate of 1.09% of gross loans and leases beginning in 3Q 2007. This was the level that Northern Trust's ALLL reached by the end of the Class Period. Even after the Class Period, the Company's ALLL continues to remain at this level. From 4Q 2009 through 4Q 2010, the ALLL has consistently remained between 1.11% and 1.17% of gross loans and leases.

155.     Beginning in January 2009, defendants were forced to recognize impairment changes but did not disclose the true extent of the impairments to Northern Trust's loans:

---

10      The net effect of the reserve increases have been calculated on an after tax basis using Northern Trust's effective tax rate for the respective periods.

- For the quarter ended December 31, 2008, Northern Trust recorded *$75.8 million* in excess loss provisions and net charge-offs, which *negatively impacted its diluted EPS for the quarter by $0.22*. This compared to $10.3 million in charges in the same quarter in the previous year. In addition, its nonperforming assets sharply increased to $100.2 million up from $29.3 million at December 31, 2007.

- For the quarter ended March 31, 2009, Northern Trust recorded *$57.7 million* in excess loss provisions and net charge-offs, which *negatively impacted its diluted EPS for the quarter by $0.17*. This compared to $22.4 million in charges in the same quarter in the previous year. Its nonperforming assets again jumped to $167.8 million.

- For the quarter ended June 30, 2009, Northern Trust recorded *$104.7 million* in excess loss provisions and net charge-offs, which *negatively impacted its diluted EPS for the quarter by $0.29*. This compared to $14.7 million in charges in the same quarter in the previous year. Its nonperforming assets continued to climb to $227.9 million.

156. Ultimately, at the Class Period's end, Northern Trust substantially increased its loan loss reserve, from 0.57% of its total loans as of October 31, 2007 to 1.09% of its loans as of October 31, 2009. Its reserve ballooned from $143.2 million at the end of 3Q 2007 to $307.8 million by the end of 3Q 2009. Likewise Northern Trust's provision for credit losses greatly increased to $215 million in 2009, *a nearly twelve-fold increase* since 2007. Further, defendants acknowledged that its net charge-offs and nonperforming assets had also increased radically. Charge-offs, net of recoveries, jumped from $2 million for 3Q 2007 to $46.1 million in 3Q 2009 – an increase of *over twenty-three* times. And its nonperforming assets associated with Northern Trust's portfolio similarly jumped from $29.3 million to $301.5 million for the same time period.

**DEFENDANTS' INSIDER TRADING AS A FURTHER INDICIA OF SCIENTER**

157. Defendants' Class Period misstatements and omissions enabled the Individual Defendants to unload nearly 340,000 shares of their Company stock at artificially inflated prices for proceeds exceeding $22 million. However, in the year prior to the Class Period, the Individual Defendants only sold a little over 154,000 shares for proceeds of approximately $9.6 million. Thus, as is plainly evident, the Individual Defendants *sold more than double the amount of shares* during

- 80 -

the Class Period than the year prior, all the while *reaping insider profits of more than double* the previous year's stock sales. As detailed further herein, the Individual Defendants' insider trades were timed to take advantage of immediate artificial inflation of Northern Trust's stock price, at the expense of unwitting investors.

158. Defendants' insider trading was unusual and suspicious for at least the following reasons:

(a) Each of the sellers sold a material portion of their Northern Trust common stock holdings;

(b) The insider selling followed after the issuance of materially false and misleading statements, as well as the fact that at the time each Individual Defendant sold their stock, they had knowledge or access of material adverse facts concerning the Company's business; and

(c) The insider trading occurred at high prices relative to where the price of Northern Trust's stock traded when the full truth concerning defendants' Class Period fraud was disclosed.

159. Specifically, Northern Trust's stock price was artificially inflated at all times during the Class Period when the Individual Defendants sold their stock due to defendants' false statements and omissions regarding defects in the Company's securities lending and the Company's business and financial results. *See* Stock Price Chart at ¶10.

160. The Individual Defendants, because of their positions with Northern Trust, controlled the contents of the Company's public statements, press releases and quarterly and annual reports disseminated throughout the Class Period. Each Individual Defendant was provided with or had access to copies of the reports and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the

Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Northern Trust's corporate statements and are therefore responsible and liable for the misrepresentations contained therein and for trading on known nonpublic information.

**LOSS CAUSATION/ECONOMIC LOSS**

161.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated and maintained Northern Trust's stock price and operated as a fraud or deceit on Class Period purchasers or Northern Trust's publicly traded stock.  Defendants did this by misrepresenting and omitting material information about the Company's securities lending program and its residential and commercial real estate loan portfolios and needed reserves.   When defendants' prior misrepresentations and omissions about securities lending and its loan loss reserves – and the resulting financial consequences to the Company – were revealed, Northern Trust's stock price fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their Class-Period purchases of Northern Trust stock, plaintiffs and other Class members, as defined at ¶2, suffered economic loss, that is, damages under the 1934 Act.

162.    The market for Northern Trust common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false or misleading statements – and failures to disclose the true state of the Company's securities lending and loan loss exposure, Northern Trust securities traded at artificially inflated prices.  Plaintiffs and other members of the Class purchased or otherwise acquired Northern Trust common stock relying upon the integrity of the market price of

- 82 -

Northern Trust common stock and market information relating to Northern Trust, ultimately suffered economic loss.

163.     As a direct result of disclosures on September 29, 2008, April 21, 2009 and October 21, 2009, Northern Trust's stock price suffered statistically significant declines.  On September 29, 2008, when defendants disclosed that Northern Trust would have to incur a pre-tax charge of approximately $525 million to support client investment funds – including several involved in the securities lending program – and another $150 million charge to specifically support securities lending funds, the Company stock price dropped nearly 19% to $64.87.  Similarly, on April 21, 2009, when defendants revealed that Northern Trust would be taking $55 million in excess loss provision charges, which negatively impacted its diluted EPS for the quarter by $0.16, the Company's stock dropped $1.98 per share on volume of nearly 14 million shares.  Finally, on October 21, 2009, defendants revealed that the Company would be taking $106 million in additional loan loss provision charges, its reserves had ballooned to $307.8 million or 1.1% of total loans and leases, and further that its nonperforming assets had skyrocketed to $292.3 million.  On that news, Northern Trust's stock plunged another $3.29 per share on volume of nearly 9 million shares.  Individually and collectively, these stock price drops removed the inflation from Northern Trust's stock price, causing real economic loss to investors who had purchased Northern Trust stock during the Class Period.

164.     The declines in Northern Trust's stock price during and at the end of the Class Period was a direct result of the nature and extent of defendants' prior false statements and omissions being revealed to investors and the market.  The timing and magnitude of Northern Trust's stock price declines and Northern Trust's admitted need to support its securities lending program and its need to greatly increase its loan loss reserve negate any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macro-economic or industry factors,

- 83 -

or Company-specific facts or circumstances unrelated to the defendants' fraudulent conduct. The economic loss, that is, damages, plaintiffs and other Class members suffered was a direct result of defendants' fraudulent scheme to inflate artificially Northern Trust's stock price and to maintain the price at artificially inflated levels, as was revealed by the subsequent and significant decline in the value of Northern Trust's stock when defendants' prior misrepresentations or omissions became publicly disclosed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

165.    At all relevant times, the market for Northern Trust common stock was an efficient market for the following reasons, among others:

(a)    Northern Trust common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, Northern Trust filed periodic public reports with the SEC and the NASDAQ;

(c)    Northern Trust regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Northern Trust was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

166.    As a result of the foregoing, the market for Northern Trust common stock promptly digested current information regarding Northern Trust from all publicly available sources and

reflected such information in the prices of the stock. Under these circumstances, all purchasers of Northern Trust common stock during the Class Period suffered similar injury through their purchase of Northern Trust common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

167.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Northern Trust who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

168.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired the common stock of Northern Trust between October 17, 2007 and October 20, 2009. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, and assigns, and any entity in which defendants have or had a controlling interest.

169.    The members of the Class are so numerous and geographically disperse across the country so that joinder of all members is impracticable. While the exact number of Class members

- 85 -

is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, there

are over 37 million shares of Northern Trust common stock outstanding, and plaintiffs believe that

there are hundreds, if not thousands, of Class members. Members of the Class may be identified

from records maintained by Northern Trust or its transfer agent and may be notified of the pendency

of this action by mail. Plaintiffs' claims are typical of the claims of the other members of the Class

in that all members of the Class have been damaged by the acts of defendants, which caused

members of the Class to purchase Northern Trust common stock at artificially inflated prices.

170. Plaintiffs will fairly and adequately protect the interests of the other members of the

Class. To assist him in that endeavor, plaintiffs have retained counsel competent and experienced in

class and securities litigation. Plaintiffs are not aware of any interest which is antagonistic to the

interests of the Class.

171. Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

(a) whether the 1934 Act was violated by defendants' acts, as alleged herein;

(b) whether any materially false or misleading statements were made and/or

defendants omitted material facts necessary to make statements made, in light of the circumstances

under which they were made, not misleading; and

(c) to what extent the members of the Class have sustained damages and the

proper measure of damages.

172. A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, because

the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to pursue individual redress for

- 86 -

the damages caused to them by defendants' acts. Plaintiffs are not aware of any difficulty that will be presented in managing this action as a class action.

## COUNT I

### Violation of §10(b) of the 1934 Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

173.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-172.

174.    During the Class Period, defendants carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period did, deceive the investing public, including plaintiffs and other Class members, as alleged in this Complaint, and caused plaintiffs and other members of the Class to purchase Northern Trust stock at artificially inflated prices. In furtherance of this unlawful scheme and course of conduct, defendants, and each of them, took the actions set forth in this Complaint.

175.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Northern Trust stock in violation of §10(b) of the 1934 Act and Rule 10b-5. All defendants are sued as primary participants in the wrongful and illegal conduct and fraudulent scheme and course of business charged in this Complaint.

176.    These defendants employed devices, schemes, and artifices to defraud. While in possession of material adverse non-public information, they engaged in acts, practices, and a scheme as alleged herein in an effort to assure investors of Northern Trust business and financial success and prospects for continued substantial growth. This included the making of, or the participation in the making of, untrue statements of material fact and concealing facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading. This conduct artificially inflated the price of Northern Trust stock and operated as a fraud and deceit upon the purchasers of Northern Trust stock during the Class Period, proximately causing them economic loss and damage. Through a series of disclosures, as identified herein, the prior misrepresentations and other fraudulent conduct of defendants became apparent, *i.e.*, the truth entered the market and the artificial inflation in Northern Trust's stock price came out of the price as it collapsed to as low as $54.16 per share – all on statistically significant, company-specific stock price decline not due to general stock market movements, changed economic conditions, changed investor expectations or company-specific negative events or information unrelated to the alleged misrepresentations and other fraudulent conduct.

177. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in this Complaint, or acted with reckless disregard of the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

178. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Northern Trust stock was artificially inflated during the Class Period. Relying directly, or indirectly, on the false and misleading statements made by defendants or upon the integrity of the market in Northern Trust stock, plaintiffs and the other members of the Class purchased Northern Trust stock during the Class Period at artificially high prices.

179. At the time of defendants' misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity. Had plaintiffs and the other members of the Class and the market known the truth which was not disclosed by defendants, plaintiffs and other members of the Class would not have purchased their Northern Trust stock, or, if they had acquired

- 88 -

such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

180.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's stock during the Class Period.

## COUNT II

### Violation of §20(A) of the 1934 Act Against All Defendants

181.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-180.

182.     The Individual Defendants acted as controlling persons of Northern Trust within the meaning of §20(a) of the 1934 Act as alleged in this Complaint.  By virtue of their business expertise, their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

183.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged in this Complaint, and exercised the same.  The Company controlled the Individual Defendants and all of its employees.

595068_1

184.     As set forth above, Northern Trust and the Insider Defendants each violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint as the operable complaint for class purposes;

B.     Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 to assure that the Class has an effective remedy;

D.     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: February 1, 2011

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
JAMES A. CAPUTO
CATHERINE J. KOWALEWSKI
MATTHEW I. ALPERT

s/ JAMES A. CAPUTO
JAMES A. CAPUTO

655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

MILLER LAW LLC
MARVIN A. MILLER
LORI A. FANNING
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312/332-3400
312/676-2676 (fax)
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Liaison Counsel

VANOVERBEKE MICHAUD
  & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2011, I authorized the electronic filing of the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on February 1, 2011.

s/ JAMES A. CAPUTO
JAMES A. CAPUTO

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  jimc@rgrdlaw.com

- 1 -

595068_1

# Mailing Information for a Case 1:10-cv-05339

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I Alpert**
  malpert@rgrdlaw.com

- **James A. Caputo**
  jimc@rgrdlaw.com,stremblay@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **Justin Bishop Grewell**
  courtnotification@mayerbrown.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,ajewell@millerlawllc.com,LFanning@millerlawllc.com,JRamirez@millerlawllc.com

- **Brian O O'Mara**
  briano@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michele Louise Odorizzi**
  courtnotification@mayerbrown.com,modorizzi@mayerbrown.com

- **John Joseph Tharp , Jr**
  courtnotification@mayerbrown.com,jtharp@mayerbrown.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
City of Westland Police & Fire Retirement System
'
```