**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **NECA-IBEW PENSION FUND (THE DECATUR PLAN) and CITY OF WESTLAND POLICE & FIRE RETIREMENT SYSTEM,** individually and on behalf of all others similarly-situated, | ) ) ) ) ) |
| | )    **No. 10-cv-5339** |
| **Plaintiff,** | ) |
| | )    **Judge Joan H. Lefkow** |
| **v.** | ) |
| | ) |
| **NORTHERN TRUST CORPORATION, et al.** | ) |
| | ) |
| **Defendants.** | ) |

## OPINION AND ORDER

Lead plaintiff City of Westland Police and Fire Retirement System and named plaintiff

United Wire Metal and Machine Pension Fund (the "plaintiffs") are two pension funds that

purchased shares of defendant Northern Trust Corporation.  They allege a series of fraudulent

statements or omissions through which Northern Trust artificially inflated the price of its stock.

The funds, on behalf of the certified class, filed an amended complaint in which they allege

violations of federal securities laws against Northern Trust and three executives (the

"defendants").  (*See* Am. Compl. (Dkt. 28).)  The defendants move to dismiss, arguing that the

complaint fails the heightened pleading requirements for allegations of securities fraud.  Also

before the court is the plaintiffs' motion to strike some of the exhibits to the defendants' motion

to dismiss.  For the reasons that follow, the motion to dismiss is granted, while the motion to

strike is denied as unnecessary.

## BACKGROUND

The following facts are taken from the complaint and accepted as true for purposes of ruling on the motion to dismiss. Northern Trust is a publicly-traded bank holding company in Chicago. Through subsidiaries, it offers banking and wealth management services to businesses and high net-worth individuals. During the relevant time period, defendant William Osborn served as Northern Trust's chief executive officer through December 2007, and chairman of the board. Defendant Frederick Waddell served as Northern Trust's president and, since January 2008, as chief executive officer. Defendant Steve Fradkin served as Northern Trust's chief financial officer through September 2009 and as president of its Corporate and Institutional Business Unit since September 2009.

As a publicly-held company, Northern Trust releases financial statements on a quarterly basis. The plaintiffs' claims involve the statements or omissions made by the defendants about the quarterly financial statements released during the class period, October 17, 2007 through October 20, 2009. At the time, the mortgage market was unraveling, which reverberated throughout the general financial markets and led to the collapse of many financial institutions. Northern Trust's allegedly false or misleading statements concerned two components of its business: its loan portfolio and its securities lending services.

## I. LOAN PORTFOLIO

The plaintiffs allege that statements made by Northern Trust in conjunction with the release of its quarterly financial statements misled investors into believing that its loan loss reserves were adequate. Generally accepted accounting principles require a lender to set funds aside in reserve to cover anticipated losses from nonperforming loans. Northern Trust set aside a

loan loss provision each quarter to add to its total loan loss reserve, and announced the amount of

the provision and the total reserve in each quarterly financial statement. The plaintiffs contend

that during the class period, Northern Trust failed to set aside adequate reserves. At the

beginning of the class period, Northern Trust recorded a quarterly loan loss provision of just $6

million and total reserves of $143 million, or .57% of its total loans. (Am. Compl. ¶ 122.) But

by the end of the class period, Northern Trust's quarterly loan loss provision had grown to $60

million and its total reserve had grown to $333 million, or 1.09% of its total loans. (*Id.* ¶¶ 67,

122.)

The plaintiffs allege that Northern Trust should have built up a bigger reserve by setting

aside reserves in the amount of 1.09% of its total loans throughout the class period, not just at the

end. According to the plaintiffs, a bigger reserve was required because (1) the real estate market

was collapsing, including in Florida, Illinois, and Arizona where most of Northern Trust's loans

were concentrated, and (2) Northern Trust had "sacrificed loan quality by originating riskier

loans, such as adjustable-rate or second-home mortgages." (*Id.* ¶¶ 64, 67.) The plaintiffs allege

that Northern Trust misled investors about the need for higher loan loss reserves by repeatedly

misrepresenting the quality of its loan portfolio. Specifically, they allege that with the release of

each quarterly financial statement then-chief financial officer Steven Fradkin described the

quality of Northern Trust's loan portfolio in overly rosy terms, such as:

- "pristine credit quality remains a hallmark of Northern Trust," referring to "longstanding consistent and prudent strategies" (*Id.* ¶ 74) (November 8, 2007, remarks to analysts and the media);

- "loan portfolio for us has been extremely clean" (*Id.* ¶ 78) (January 16, 2008, remarks to analysts, the media and investors);

- "[c]redit quality remained exceptionally strong" (*Id.* ¶ 81) (April 15, 2008, remarks to analysts);

- "our conservative practices and policies have not wavered" (*Id.* ¶ 83) (May 28, 2008, remarks to analysts, the media and investors);

- "[c]redit quality remains strong" and "our credit metrics remain outstanding" (*Id.* ¶ 95) (October 22, 2008, remarks to analysts, the media, and investors); and

- "our portfolio it is quite different from many other banks. . . . The quality of the portfolio continues to be very sound" (*Id.* ¶ 115) (July 22, 2009, remarks to analysts, the media, and investors).

The plaintiffs allege that president and CEO Frederick Waddell also made overly positive statements about Northern Trust's loan portfolio.

- referring to the "high quality of our loan and investment portfolios" (*Id.* ¶ 94) (October 22, 2008 remarks in press release); and

- "[o]ur outstanding credit quality is noticeably better than our peers'" (*Id.* ¶ 102) (January 28, 2009, remarks to analysts and the media).

## II.    SECURITIES LENDING SERVICES

Another financial service that Northern Trust provides to its clients is securities lending. Northern Trust acts as an agent on behalf of the owners of securities who are seeking to lend the securities to borrowers. As part of the transaction, the borrower must post collateral with the lender, typically cash worth about 102-105% of the value of the securities. While the securities are on loan, Northern Trust invests the collateral in fixed-income securities, earning interest. When the loan terminates, the collateral is returned to the borrower along with a rebate as

compensation for use of the collateral. Northern Trust splits the interest generated by investing the collateral with the lender, less the rebate paid to the borrower who put up the collateral.

The plaintiffs allege that while Northern Trust should have been prudently investing the collateral in "conservative, low-risk" securities, it opted for "longer-duration and riskier investments, such as asset- and mortgage-backed securities" to increase the interest generated, which in turn increased the revenue Northern Trust generated. (*Id.* ¶¶ 25, 40.) The plaintiffs allege that Northern Trust continued to hold on to mortgage-backed and similarly risky securities, including its interests in Sigma Finance Corporation, Theta Finance Corporation, and Lehman Brothers Holdings, Inc., despite signs that mortgage-related markets were unraveling.

On September 15, 2008, one of those holdings, Lehman Brothers, petitioned for bankruptcy. On September 17, 2008, Northern Trust issued an SEC Form 8-K report publicly acknowledging that its collateral pools held Lehman Brothers securities, that Lehman Brothers had borrowed securities from Northern Trust's securities lending program, and that the Lehman Brothers securities were now impaired. On September 21, 2008, Northern Trust announced that holdings in Lehman, Sigma and Theta were permanently impaired resulting in a collateral deficiency, meaning the value of the collateral posted by borrowers now fell short of the value of the securities lent. On September 22, 2008, Northern Trust issued a press release quantifying the exposure caused by the Lehman Brothers bankruptcy at $821 million. On September 29, 2008, Northern Trust announced that it would take a pre-tax charge of approximately $525 million to "support various funds and to buy back illiquid auction rate securities," and would also incur a pre-tax charge of approximately $150 million "to provide support for securities lending clients whose cash collateral [was] negatively impacted by recent market events." (*Id.* ¶ 58.)

### III.     STOCK PRICE DROPS

The plaintiffs allege that Northern Trust's fraudulent statements or omissions about its loan portfolio and securities lending services artificially inflated the value of its shares.  At the beginning of the class period, the release of its results for the third quarter of 2007 saw the price of its shares rise from $69.26 per share to more than $74.00 per share.  (*Id.* ¶ 71.)  A year later they traded at more than $80 per share.  (*Id.* ¶ 88.)  But upon its September 29, 2008 announcement that, in the wake of the bankruptcy filing of Lehman Brothers, it was taking pre-tax charges of $150 million to support its securities lending clients, the price of Northern Trust's stock fell 18.81% to $64.88 per share.  (*Id.* ¶ 59.)  On April 21, 2009, the price fell $1.98 a share to $56.17, when Northern Trust disclosed its results for the first quarter of 2009, including that its quarterly loan loss provision had risen to $55 million and total reserve had risen to $286.2 million.  (*Id.* ¶ 106.)  By the end of the class period on October 21, 2009, the announcement that Northern Trust's credit loss provision for the third quarter was $60 million and its total reserve was $333 million saw the price of its stock drop $3.29 per share to $54.16.  (*Id.* ¶¶ 118, 119.)

The plaintiffs' complaint consists of two counts.  In Count I, the plaintiffs allege that Northern Trust and each of the individual defendants violated Section 10(b) of the Securities Exchange Act of 1934, as well as Securities and Exchange Commission Rule 10b-5, by deceiving investors about known threats to its loan portfolio and securities lending services.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  In Count II, the plaintiffs allege control person liability under Section 20(a) of the Securities Exchange Act of 1934.  *See* 15 U.S.C. § 78t(a).

## ANALYSIS

### I.     MOTION TO DISMISS (Dkt. 34)

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). To state such a claim, the complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis, but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. In ruling on a 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiffs' complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002).

Allegations of fraud are subject to the heightened pleading standard of Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This requirement is met by pleading the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). In addition, private securities actions such as this one must also satisfy the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), under which a complaint must "'with respect to each act or omission . . . state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Pugh* v. *Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)). Allegations that are based on information and belief must set forth "with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

A.        **Count I:  Violation of § 10(b) and Rule 10b-5**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . ."  15 U.S.C. § 78j(b).  Section 10b-5 is implemented by Securities and Exchange Commission Rule 10b-5, which makes it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  To show a violation of § 10(b) and Rule 10b-5, the plaintiffs must establish that the defendants (1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) on which the plaintiffs justifiably relied and (6) that the false statement proximately caused the plaintiffs' damages.  *See Caremark, Inc.* v. *Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997) (citations omitted).  The plaintiffs allege that the defendants violated § 10(b) and Rule 10b-5 by making false or misleading statements or omissions (1) as to whether Northern Trust's loan loss reserves were adequate in light of the condition of its loan portfolio and (2) failing to reveal risky investment strategies used by Northern Trust's securities lending business.

1.      **Loan Loss Reserves**

a.      **False Statement or Omission**

The plaintiffs allege that the defendants violated § 10(b) and Rule 10b-5 by falsely portraying that Northern Trust's loan portfolio was "pristine" and "strong" when, in fact, it failed to maintain an adequate loan loss reserve and relaxed its standards in order to make increasingly risky loans.  Defendants argue that the portion of Count I involving statements about its loan portfolio should be dismissed because the facts alleged do not plausibly suggest that Northern Trust failed to set aside adequate reserves or relaxed its lending standards.  Therefore, the defendants contend, the plaintiffs have not plausibly suggested that their statements were false.

In response, the plaintiffs rely on their allegation that Northern Trust should have maintained reserves at 1.09% of total loans throughout the class period, the level at which reserves stood at the end of the class period and have stood ever since.  (Am. Compl. ¶ 154.)  The allegation evokes the "fraud by hindsight" theory under which a plaintiff attempts to show that because huge reserves were required at the end of the class period, the defendant must have known that its reserves were inadequate all along.  However, the Seventh Circuit has rejected attempts to plead fraud by hindsight.  In *DiLeo* v. *Ernest & Young*, it explained that "plaintiffs may not proffer the different financial statements and rest" but, rather, must "point to some facts suggesting that the difference is attributable to fraud."  *DiLeo*, 901 F.2d at 627.

The plaintiffs dispute that they rely on the fraud by hindsight theory.  Rather, they contend that they have "allege[d] specific, concrete reasons" that Northern Trust's reserves were inadequate:  (1) the deteriorating mortgage market generally, and (2) the deteriorating condition of Northern Trust's existing loan portfolio.  (Response (Dkt. 37) at 8.)  The plaintiffs allege that

the collapse of the real estate market generally and the resulting failure of numerous financial institutions should have alerted Northern Trust that its reserves were inadequate.  But the plaintiffs have alleged no facts to show that Northern Trust ignored the conditions or that it failed to increase its loan loss provisions each quarter to account for those conditions.  To the contrary, according to the plaintiffs' allegations, Northern Trust repeatedly increased the quarterly loan loss provisions as the mortgage market continued to deteriorate over the class period, from $6 million for the quarter beginning the class period to $60 million for the quarter ending the class period.  (Am. Compl. ¶ 122.)  Thus, the plaintiffs have alleged no facts to show that the defendants' descriptions of the conditions of Northern Trust's portfolio, or its loan loss reserves, were inaccurate when made.

Moreover, while the defendants described Northern Trust's portfolio as "pristine" and "strong," an examination of the full context of their statements reveals that the characterizations were made along with warnings that market conditions were deteriorating, which could impact Northern Trust.  While discussing Northern Trust's financial statement for the third quarter of 2007 with analysts at the beginning of the class period, chief financial officer Steve Fradkin warned that the "cycle of credit quality has been very, very good for quite some time, and it can only get so good.  So is our antenna up?  Yes, every quarter we talk about the quality of our loan portfolio, and it is outstanding, but it won't stay there forever."  (Am. Compl. ¶ 74).  Fradkin also acknowledged that the market "is changing, and I think you're seeing that in the results that most banks are putting up and we're not above that."  (*Id.*)

Fradkin's warnings continued throughout the class period.  While addressing results from the second quarter of 2008, he again warned that "it is a very difficult environment and we are

not immune to that environment." (Am. Compl. ¶ 86.) He specifically addressed "a disproportionate amount of stress in the west coast of Florida. . . . I guess if I had to pick a place, I'd pick the west coast of Florida, as the one we have to keep the closest eye on." (*Id.*) Later, while addressing third quarter 2008 results, he again acknowledged the deteriorating market conditions and its effect on Northern Trust's reserves: "So we believe that we are appropriately reserved for the environment that we've got. Our coverage has gone up as the environment has deteriorated . . ." (Am. Compl. ¶ 99.) Given that context, the plaintiffs have failed to plausibly allege that the defendants ignored market conditions generally or the possibility that those conditions could negatively impact Northern Trust's portfolio.

In addition to general market conditions, the plaintiffs allege facts specific to Northern Trust's portfolio they contend also should have alerted Northern Trust to the need for greater loan loss provisions. For instance, they cite (1) the growth in nonperforming assets within the loan portfolio, from $29.3 million at the beginning of the class period to $301.5 million at the end of the class period, (2) the growth in net charge-offs (loans that will never be paid), from $8.8 million at the beginning of the class period to $125.8 million at the end, and (3) the fact that Northern Trust had assigned its riskiest classification to loans totaling $700 million. (Am. Compl. ¶ 131.) But, again, the plaintiffs have alleged no facts that Northern Trust ignored those developments or failed to account for them. In fact, Northern Trust reported those developments in its quarterly financial statements. In addition, it repeatedly increased its quarterly loan loss provisions in tandem with the increase in nonperforming assets, net charge-offs, and the growth in the number of loans classified as risky.

Page 11

The plaintiffs' allegations stand in sharp contrast to those in *Jones* v. *Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1020 (N.D. Ill. 2010), where the plaintiff specified unfavorable information about the condition of the defendant's loan portfolio that the defendant had withheld, and that contradicted the defendant's public statements about the portfolio. For instance, the plaintiffs alleged that, according to confidential sources including a former vice-president and senior construction manager, construction on condominiums financed by the defendant had fallen behind schedule, construction costs had skyrocketed, developers were unable to obtain additional financing needed to complete the condominiums, buyers who had placed down payments on units were walking away from their purchase commitments, and the defendant's creation of Special Purpose Entities to hide its distressed properties, all of which was withheld from investors. *See Corus Bankshares*, No. 09 CV 1538, Dkt. 66 ¶ 56 (N.D. Ill.). The court held that the allegations of information that was withheld and that contradicted public statements plausibly suggested that the defendant had misled investors about the adequacy of its reserves. *See Corus Bankshares, Inc.*, 701 F. Supp. 2d at 1020.

The only information the plaintiffs in the instant case allege was withheld was that Northern Trust had begun to "sacrifice[] loan quality by originating riskier loans, such as adjustable-rate or second-home mortgages to maintain its client base," and had "concentrated [its] loan portfolio in real estate markets that were already showing signs of overheating, such as in Illinois, Florida and Arizona." (Am. Compl. ¶ 64.) But the plaintiffs have not identified the source of those alleged facts. In order to satisfy the heightened pleading requirements of the PSLRA, a plaintiff must specify the reasons why a statement is misleading. *See* 15 U.S.C. § 78u-4(b)(1). Allegations that cannot be attributed to a source with knowledge are insufficient.

*See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund* v. *Allscripts-Misys Healthcare Solutions, Inc.*, 707 F. Supp. 2d 774, 783 (N.D. Ill. 2010) (where a plaintiff does not purport to have firsthand knowledge of its allegations, it must describe its source in detail in order to satisfy the requirements of the PSLRA). Thus, when a plaintiff relies on an insider or other confidential source for the facts alleged, the plaintiff must specify the source's relationship to the company in order to establish that the source has a basis for the knowledge it provided. *See Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 513 F.3d 702, 712 (7th Cir. 2008). The plaintiffs here have failed to identify any specific source for their purported knowledge other than to state generally that their allegations are based on a review of publicly-available information. The plaintiffs' failure to specify the source of their allegations run afoul of the requirements of the PSLRA. *See Allscripts-Misys*, 707 F. Supp. 2d at 783.

Because the plaintiffs have not identified facts supporting their allegations that reserves were inadequate or that Northern Trust had relaxed its lending standards, they have failed to plausibly suggest that Northern Trust's statements about the condition of its loan portfolio were false.

### b. Scienter

In addition to failing to plead a false statement or omission, the plaintiffs have also failed to plead scienter. To establish scienter in the securities fraud context, the plaintiff must show that "the defendants either knew that the representations they made to investors were false or were reckless in disregarding a substantial risk that they were false." *Securities & Exchange Commission* v. *Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008). In assessing whether a plaintiff has sufficiently pleaded scienter, a court must "consider the complaint in its entirety" to determine

"whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) (emphasis in original). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.*

The plaintiffs argue that they have raised a strong inference of scienter by alleging that the defendants knew or had access to information that Northern Trust had relaxed its lending standards and that its loan portfolio was deteriorating. According to the plaintiffs, by alleging that the defendants knew about the deteriorating condition of Northern Trust's loan portfolio, they have created a strong inference that the defendants also knew that their statements that the portfolio was "pristine" and "clean" were false or made in reckless disregard of the truth. However, as described above, in fact the defendants repeatedly acknowledged the deteriorating conditions generally, and that they were affecting Northern Trust's portfolio. Indeed, in statements made about results from the fourth quarter of 2008, Fradkin acknowledged that while the quality of the loan portfolio was still "high," it was no longer "pristine," and had "deteriorated clearly consistent with the environment." (Am. Compl. ¶ 101.)

The only information that the plaintiff have specifically alleged was withheld by the defendants was Northern Trust's purported relaxation of its lending standards. But as discussed above, this allegation is inadequate because the plaintiffs have not identified its source. In any event, allegations that "a defendant was aware of the allegedly undisclosed information" without more is insufficient to create an inference of scienter. *New Orleans* v. *Privatebancorp, Inc.*, No. 10 C 6826, 2011 WL 5374095, at *4 (N.D. Ill. Nov. 3, 2011).

Alternatively, the plaintiffs attempt to create an inference of scienter with allegations that the individual defendants reaped millions of dollars by selling shares of Northern Trust while prices were artificially inflated. Specifically, they allege that former chairman of the board and chief executive officer William Osborn sold shares worth $19.8 million during the class period, while president and current chairman of the board Frederick Waddell sold shares worth $2.3 million, and former chief financial officer and current president of the corporate and institutional business unit Steven Fradkin sold shares worth $330,305. The plaintiffs also allege that the individual defendants were incentivized to portray Northern Trust's loan portfolio as strong because they received additional compensation for achieving performance goals.

"Without more, an executive's sale of stock does not lead to the conclusion that he engaged in fraud." *Davis* v. *SPSS, Inc.*, 385 F. Supp. 2d 697, 713 (N.D. Ill. 2005). The "sale must be suspicious in scope or timing to support an inference of *scienter*." *Id.* The plaintiffs have alleged no facts that would show the sales to be suspicious, such as facts showing that the sales were out of line from the defendants' trading histories. Without such context, the plaintiffs have not alleged scienter. *Silverman* v. *Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *13 (N.D. Ill. Sept. 23, 2008) (plaintiffs failed to allege scienter because they did not show that sales of stock were out of the ordinary). Likewise, allegations that an executive's bonuses were tied to his corporation's performance do not support an inference of scienter. *Boca Raton Firefighters' & Police Pension Fund* v. *DeVry, Inc.*, No. 10 C 7031, 2012 WL 1030474, at *12 (N.D. Ill. Mar. 27, 2012) (executive bonuses tied to performance are too commonplace to support an inference of scienter).

In short, the plaintiffs have simply failed to allege facts showing that the defendants acted to mislead investors about the strength of Northern Trust's portfolio or the adequacy of its loan loss reserves. As a result, their allegations stand in sharp contrast to those in cases such as *Corus Bankshares*, where the plaintiffs plausibly suggested scienter by alleging facts showing that the defendants secretly created Special Purpose Entities to hide distressed properties from investors. *See Corus Bankshares*, 701 F. Supp. 2d at 1022.

In the absence of factual allegations supporting an inference that the defendants intended to mislead investors about their loan portfolio and loan loss reserves, the plaintiffs have failed to allege scienter with the particularity required under Rule 9(b) and the PLSRA. Accordingly, the motion to dismiss the portion of Count I regarding Northern Trust's loan loss reserves is granted.

### 2. Securities Lending

Next, the plaintiffs allege a violation of § 10(b) and Rule 10b-5 based on the following statements or omissions about Northern Trust's securities lending services:

- repeated assurances during the class period that even though the value of collateral had dropped in one of Northern Trust's collateral pools, known as the STEP holdings, the collateral would mature at par value;

- Northern Trust's failure to disclose that it had shifted to an investment strategy that sought higher returns on the securities held by its collateral pools, but which also made the pools' portfolios longer-term, riskier, and increasingly illiquid;

- Northern Trust's failure to disclose unrealized losses in the collateral pools, instead encouraging investors to continue their participation in the pools; and

- Northern Trust's failure to disclose that it had not properly "mitigate[d] increasingly significant investment exposures.

(Resp. (Dkt. 37) at 24.)

### a.     Forward-Looking Statement

The only false statements that the plaintiffs contend constitute a violation of § 10(b) and Rule 10b-5 are statements made by Fradkin that Northern Trust "continue[s] to expect that the [STEP] fund's holdings will mature at par." (Am. Compl. ¶¶ 83, 86.) Fradkin made the statements while addressing the fact that although the value of securities held in the STEP fund had dropped, the securities had not yet been sold, no loss had been realized, and Fradkin expected the securities to regain the lost value before they matured. (Am. Compl. ¶¶ 83, 86.)

Because Fradkin's statements about his expectations for the STEP fund are forward-looking, the required level of scienter is "actual knowledge." 15 U.S.C. § 78u-5(c)(1)(B)(i); *Matrixx Initiatives, Inc.* v. *Siracusano*, 131 S. Ct. 1309, 1324 n.14, 179 L. Ed. 2d 398 (2011). The plaintiffs have not pleaded with particularity facts to show that Fradkin had actual knowledge that the collateral would not mature at par. Instead, they argue that Fradkin must have known the collateral holdings would not mature at par because he assessed the pool's holdings daily and, therefore, should have known that the securities it held were at risk. (Response (Dkt. 37) at 34.) However, the plaintiffs' argument fails to take into account the heightened level of scienter required for forward-looking statements, which is based not on what a defendant should have known but, rather, "actual knowledge." 15 U.S.C. § 78u-5(c)(1)(B)(i). Because the plaintiffs have not alleged actual knowledge, they have not plausibly suggested that Fradkin's forward-looking statements violated § 10(b) or Rule 10b-5.

### b.    Omissions

The remainder of the plaintiffs' claim involves alleged omissions.  Specifically, the

plaintiffs contend that they have established a violation of § 10(b) and Rule 10b-5 by alleging the

defendants failed to disclose:  (1) collateral was being invested in high-earning but risky and

illiquid securities; (2) the value of those securities had dropped; and (3) Northern Trust had not

properly mitigated the risk presented by these securities.  The Supreme Court has addressed

attempts to plausibly suggest violations of Section 10(b) and Rule 10b-5 by alleging omissions:

> Moreover, it bears emphasis that § 10(b) and Rule 10b-5(b) do not
> create an affirmative duty to disclose any and all material
> information.  Disclosure is required under these provisions only
> when necessary "to make . . . statements made, in the light of the
> circumstances under which they were made, not misleading."
> 17 CFR § 240.10b-5(b); *see also Basic*, 485 U.S., at 239, n.17,
> 108 S. Ct. 978 ("Silence, absent a duty to disclose, is not
> misleading under Rule 10b-5").  Even with respect to information
> that a reasonable investor might consider material, companies can
> control what they have to disclose under these provisions by
> controlling what they say to the market.

*Matrixx Initiatives*, 131 S. Ct. at 1321-22.  Therefore, to plausibly suggest securities fraud based

on an omission, a plaintiff must allege not only information that was withheld, but also

information whose disclosure was necessary to prevent information that was disclosed from

being misleading.  *Id.*

Plaintiffs have not specified any statements made by the defendants that were misleading

because of the alleged omission.  Rather than identifying any specific statements, they refer only

generally to the defendants "[h]aving repeatedly spoken about the securities-lending program's

operating status."  (Resp. (Dkt. 37) at 25.)  By failing to identify specific statements made by the

defendants, the plaintiffs have left the court unable to assess whether the plaintiffs have plausibly alleged omissions that were necessary to avoid making the defendants' statements misleading.

Although the plaintiffs have not identified specific statements made misleading by the defendants' alleged omissions, they have alleged statements in which the defendants acknowledge the adverse impact of market conditions on the collateral pools. For example, at the beginning of the class period during a conference call for analysts to discuss third quarter 2007 results, Fradkin stated that the "credit market environment in this year's third quarter had a negative impact on securities lending results that we're reporting today." (Am. Compl. ¶ 70.) In statements the plaintiffs omitted from their excerpts of the conference call, Fradkin went on to note that Northern Trust's "securities lending results in the third quarter were adversely impacted by this summer's disruption in the credit environment, which began with concerns in the subprime mortgage market and spread to the fixed income arena more broadly." (Transcript of October 17, 2007 Earnings Call (attached as Exhibit L[1] to Defendants' Exhibits to the Motion to Dismiss(35-1) at 6.) In remarks made to analysts regarding fourth quarter 2007 results, Fradkin again acknowledged that "[p]ricing pressure on fixed-income securities continued." (Transcript of January 16, 2008 Earnings Call (attached as Exhibit M[2] to Defendants' Exhibits to the Motion to Dismiss (Dkt. 35-1) at 5.)

---

[1]Exhibit L [Dkt. 35-1] is not the subject of the plaintiffs' Motion to Strike. It is the full transcript of a conference call with analysts excerpted by the plaintiffs in their amended complaint. Because the conference call is mentioned in the complaint and statements made during the call are central to the plaintiffs' claims, the court can consider the transcript in ruling on the motion to dismiss. *See Sullivan* v. *Alcatel-Lucent USA, Inc.,* No. 12 CV 7528, 2013 WL 228244, at *2 (N.D. Ill. Jan. 22, 2013).

[2]As with Exhibit L discussed in the previous footnote, Exhibit M (Dkt. 35-1) is the transcript of a conference call with analysts that is mentioned in the complaint and central to the plaintiffs' claims. The court can therefore consider the transcript in ruling on the motion to dismiss. *See Sullivan,* 2013 WL 228244, at *2.

The plaintiffs contend that Fradkin's statements applied only to a single collateral pool—the STEP fund—and were misleading in that they did not acknowledge similar problems across all of Northern Trust's collateral pools.  However, the full transcripts of Fradkin's statements do not support the plaintiffs' assertion.  Fradkin's October 17, 2007, statement that securities lending results were adversely impacted by the subprime mortgage were made during background information he gave to explain Northern Trust's securities lending services and appear to concern the services generally.  Only then did he proceed to focus specifically on the negative impact on the STEP fund, explaining that the impact on it was more profound because it was a mark-to-market fund whose assets were revalued daily, even though the assets were not being sold and thus not realizing losses.  (Transcript of October 17, 2007 Earnings Call (attached as Exhibit L to Defendants' Exhibits to the Motion to Dismiss (Dkt. 35-1) at 6.)

In light of these disclosures by the defendants, and the plaintiffs' failure to identify statements made misleading by the omissions alleged, the plaintiffs have not plausibly alleged omissions that violated § 10(b) or Rule 10b-5.  Accordingly, the motion to dismiss the portion of Count I involving Northern Trust's securities lending services is also granted.

B.    **Count II:  Control Person Liability under § 20(a)**

In Count II, the plaintiffs seek to hold the individual defendants liable for violations of

§ 10(b) and Rule 10b-5 by virtue of their positions as control persons of Northern Trust.  Section

20(a) of the Securities Exchange Act provides that "[e]very person who, directly or indirectly,

controls any person liable under any provision of this chapter . . . shall also be liable jointly and

severally with and to the same extent as such controlled person to any person to whom such

controlled person is liable . . . unless the controlling person acted in good faith and did not

directly or indirectly induce the act or acts constituting the violation or cause of action."

15 U.S.C. § 78t(a).  To state a claim under § 20(a) claim, a plaintiff must allege each of the

following:  (1) a primary securities violation; (2) general control over the operations of the

wrongdoer; and (3) "the power or ability to control the specific transaction or activity upon

which the primary violation was predicated, whether or not that power was exercised."  *Harrison*

v. *Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992).

The defendants seek to dismiss the control person claim on the ground that the plaintiffs

have failed to allege a primary securities fraud violation.  Because the plaintiffs failed to plead a

primary securities violation in Count I, Count II is also dismissed.  *See City of Livonia*

*Employees' Retirement Sys.* v. *Boeing Co.*, No. 09 C 7143, 2010 WL 2169491, at *7 (N.D. Ill.

May 26, 2010).

II.    **MOTION TO STRIKE DEFENDANTS' EXHIBITS (Dkt. 39)**

The plaintiffs seek to strike certain exhibits offered by the defendants in support of their

motion to dismiss.  The exhibits are: A, G through K (Dkt. 35-1), and SEC Forms 1 through 3

(Dkt. 36).  The plaintiffs contend that the exhibits are not mentioned in the complaint or subject

to judicial notice, and therefore cannot be considered by the court on a motion to dismiss. *See Sullivan* v. *Alcatel-Lucent USA, Inc.*, No. 12 C 7528, 2013 WL 228244, at *2 (N.D. Ill. Jan. 22, 2013) (court cannot consider matters outside the pleadings on a motion to dismiss except for matters attached to the complaint, central to its claims, or subject to judicial notice).

The court's consideration of the motion to dismiss did not rely on any of the exhibits subject to the motion to strike. Accordingly, the motion to strike is denied as unnecessary.

## CONCLUSION

For the foregoing reasons, the motion to strike (Dkt. 39) is denied as unnecessary and the motion to dismiss (Dkt. 34) is granted without prejudice. The plaintiffs are granted leave to file a second amended complaint by May 8, 2013. If no amended complaint is filed by that date, the dismissal will be with prejudice and the court will enter judgment in favor of the defendants.

ENTER:

Date: March 28, 2013

_____
Joan Humphrey Lefkow
UNITED STATES DISTRICT COURT